# REED *v.* PRESIDENT AND COMMISSIONERS OF TOWN OF NORTH EAST

[No. 102, September Term, 1961 (Adv.).]

230

232

*Decided July 13, 1961.*

The cause was argued before Brune, C. J., and Henderson, Prescott, Marbury and Sybert, JJ.

*Roger D. Redden,* with whom were *Richard W. Case* and *Smith, Somerville & Case* on the brief, for the appellant.

*Edward D. E. Rollins, Jr.,* for the appellees.

Sybert, J., delivered the opinion of the Court.

The appellant, as a taxpayer, brought this suit in the Circuit Court for Cecil County to test the validity of a proposed bond issue of the Town of North East. His petition prayed declaratory and injunctive relief against the effect of two resolutions passed to amend the charter of the municipal cor-

poration for the purpose of authorizing the issuance and sale of $235,000 of general obligation bonds of North East in order to construct a water treatment plant and accessory equipment and thus remedy the inadequacies of the Town's existing water supply system.

The Town Charter (§§ 221-275, Code of Public Local Laws of Cecil County, 1953 ed.) contains provisions for the issuance of general obligation water bonds, which provisions were enacted by the General Assembly as public local laws prior to the effective date of Article XI-E of the Constitution of Maryland, known as the Municipal Home Rule Amendment, approved November 2, 1954. Under those provisions, the Town established its original water supply system from the proceeds of bonds issued in 1946 and in 1948. The system has proven unsatisfactory and extensive improvements are now contemplated, including construction of the water treatment plant.

The two resolutions now under attack are amendatory of § 274 of the County Code, one of the Charter provisions of the Town. These Charter amendments were passed in pursuance of the authority given the municipalities in Maryland, other than Baltimore City, by the Municipal Home Rule Amendment and by the implementing legislation enacted by Chapter 423 of the Acts of 1955, adding §§ 9 to 43 to Art. 23A of the Maryland Code—specifically pursuant to § 13 of said Article.

The first amendatory resolution, adopted by the President and Commissioners of the Town on November 19, 1959, authorized the issuance of bonds in the amount of $300,000 (including the $150,000 sold in the 1946 and 1948 issues), and provided that the new issue should be made in accordance with the terms and conditions of a resolution or ordinance to be passed in conformity with and pursuant to the authority of §§ 31 through 39, Art. 23A, Code, and also provided that no prior referendum should be necessary in connection with any issue of bonds under § 274 as had theretofore been required by that section. No referendum petition was filed relative to this resolution as permitted by § 13 of

236

Art. 23A, Code, and therefore the resolution was declared effective as amending the Town's Charter on January 8, 1960.

The Town Commissioners caused plans to be prepared for the improvements to the water system and obtained a permit from the State Department of Health to proceed with the work. However, it became apparent that additional money would be required and question was raised as to whether the amount of bonds authorized by the resolution of November 19, 1959, could legally be issued. Furthermore, in order to economize on the costs of issuance, the Commissioners desired to have the authority to negotiate a private sale of the bonds. Accordingly, on July 19, 1960, the second of the resolutions intended to amend the Charter of the Town was passed. This resolution provides for the issuance of bonds in the aggregate amount of $385,000, which includes the $150,000 issued in 1946 and 1948, the $150,000 authorized under the resolution of November 19, 1959, and $85,000 in additional bonds, with the result that $235,000 in new funds would now be made available. It also provides that the "bonds may be sold at private sale without advertisement or publication of notice of sale or solicitation of competitive bids, any public general or public local law to the contrary notwithstanding," if the resolution or resolutions actually authorizing the issuance of the bonds shall so specify. Section 2 of the resolution provides that the amendment to the Charter of the Town proposed by the resolution should become effective on September 9, 1960, unless a proper petition for a referendum thereon should be filed as permitted by law, "provided a complete and exact copy of this resolution shall be posted in the Town Hall of North East until August 30, 1960, and provided further that a copy of the title of this resolution shall be published in 'Cecil Whig' and 'Cecil Democrat' newspapers of general circulation in the Town of North East once in each of the weeks of July 27, August 3, 10 and 17, 1960." As no referendum petition was filed with respect to this resolution, it was declared effective under its terms on September 9, 1960.

The Town Commissioners acquired a tract of land as a

site for the treatment plant and entered into negotiations with a financial institution for the private sale of the bonds authorized by the resolutions. Thereupon the appellant, as a taxpayer (and voter and resident) of North East, brought this action seeking a declaration of invalidity of the two amendatory resolutions and an injunction prohibiting issuance of the bonds.

Both below and here the appellant made the following contentions:

(1) The Town Commissioners who voted to adopt the two amendatory resolutions were neither *de jure* nor *de facto* officers of North East at the time of passage and both resolutions are therefore void and without amendatory effect.

(2) Even if the Commissioners were *de facto* officers at the time of passage, the public policy rule which might be applied to validate their ministerial acts is nevertheless inapplicable to validate their attempt to enact basic legislation under the Home Rule Amendment to the Maryland Constitution.

(3) The title of the second resolution was not published in one of the two local newspapers, as required by the resolution, and hence the resolution itself, by its own terms, did not become effective.

(4) The provision of the second resolution permitting private sale of water bonds is invalid because it conflicts with the express requirement of public sale set forth in § 34 (4) of Art. 23A, Code, on the ground that that section is binding on all Maryland municipalities (except Baltimore City).

The chancellor found in favor of the appellee Town on all points. He held, in his written opinion, that the President and Commissioners are at least *de facto* officers and as such competent to pass the resolutions and to take all other action necessary in the issuance and sale of the bonds; that the requirement of publication in two newspapers was directory and not mandatory, and that publication in one newspaper was substantial compliance with the requirement; and that the provision in Code, Art. 23A, § 34 (4) for public sale of municipal bonds is inapplicable because under § 31 of

that Article the procedure established by a municipal charter for the sale of bonds shall be paramount in case of any conflict. In his opinion, the chancellor stated that in view of his findings a declaratory decree would be unnecessary and he simply signed an order dismissing the petition of the appellant.

Additional facts will be stated, as necessary, in our consideration of the points raised by appellant.

### (1) and (2)

Since these questions are inter-related, we shall consider them together.

From the record it appears that the holding of elections for President and Commissioners of North East (hereinafter sometimes called "Board") has been somewhat sporadic. Section 223 of the County Code provides for annual elections of the Commissioners of that Town, to be held on the third Monday in March. A President and two Commissioners are to be elected in odd-numbered years to serve terms of two years each, or until their successors are elected and qualified, and the remaining two Commissioners are to be elected in even-numbered years, also to serve terms of two years each, or until their successors are elected and qualified. Section 224 (c) requires any candidate to file a certificate of candidacy at least ten days before the third Monday in March. Section 225 requires the Board annually to designate the hours and place of holding elections by giving ten days' notice posted in five prominent places in the town. Section 228 requires every elected President and Commissioner to take an oath of office, prior to entering office, before a justice of the peace of Cecil County, whose duty it is to return a certificate of qualification to the Board to be filed and recorded among its proceedings. At least since 1952, elections have been "few and far between". Without unduly extending this opinion, suffice it to say that the five Commissioners who were in office at the time of the adoption of the 1959 resolution, as well as the four Commissioners who held office at the time of the adoption of the 1960 resolution (there being one vacancy at that time) had initially either been elected or ap-

pointed as President or Commissioner as the case might be. During each of the years in which elections were not held, the record shows that notices of registration for election were posted as required by the Town's Code, and in those years in which no applications for election were received, no elections were held and the incumbent President and Commissioners simply continued to serve. It appears that this procedure was followed in the interest of saving expense and not with any idea of perpetuating the incumbent Commissioners in office. It does not appear from the record that any citizen of North East ever raised any question concerning a deprivation of the right to vote for members of the Board.

The last election actually held was on March 18, 1957 (more than two years prior to adoption of the first amendatory resolution), at which the President and one Commissioner were re-elected. On December 4, 1958, a new Commissioner was appointed by the President and remaining Commissioners (as provided by § 227) to fill an existing vacancy until the March, 1959, election.

In addition, the record reveals that over the years, with few exceptions, the Commissioners appointed or elected, either took no oath of office at all or did so before the President of the Board. It was also shown that in most cases those Commissioners who simply held over after expiration of terms to which they had been elected or appointed took no further oaths of office during the "hold-over" terms. An exception was the taking of an oath of office before a county justice of the peace by the President and one Commissioner on July 21, 1960, the date of the second amendatory resolution. Appellant points to the above mentioned requirement of § 228 of the County Code that the President and Commissioners shall, before they enter upon the duties of their office, take an oath before some justice of the peace of the county and that the justice shall return a certificate of such qualification. While § 253 of the County Code gives the President of the Board "* * * within the limits of the town all the jurisdiction and power of a justice of the peace, except as to the recovery of small debts * * *", appellant argues

that this provision is nugatory since a justice of the peace can only be a person appointed by the Governor with the advice and consent of the Senate under Article IV, § 42, of the Maryland Constitution, and that in any event § 228 requires the oath to be taken before some justice of the peace of the county duly appointed and approved in accordance with the constitutional provisions. Appellant makes the further point that no certificate of qualification, as required by § 228, has been filed since 1952 with regard to any person serving on the Board.

From the whole record before us, it is clear that all those who were incumbents at the time of the adoption of the resolutions were "hold-overs" claiming office under color of election or appointment and continuing to serve after expiration of terms to which they had either been elected or appointed. The appellees contend that the President and Commissioners were at least *de facto* officers, and that all their acts as such officers, including adoption of the two amendatory resolutions and other necessary action with respect to issuance of the bonds, are to be taken as valid and binding in the same manner as if they had been performed by *de jure* officers.

It has long been recognized in this State, as elsewhere, that the public interest requires, in the absence of any provision to the contrary, that public offices should be filled at all times, without interruption. In accordance with that policy, § 13 of Art. II of the Maryland Constitution provides that all civil officers appointed by the Governor and Senate shall, except in cases otherwise provided for in the Constitution, continue to hold office until their successors qualify according to law. In *Claude v. Wayson,* 118 Md. 477, 84 Atl. 562 (1912), this Court had occasion to construe that section in connection with § 42 of Art. IV of the Constitution, which provides that the term of justices of the peace shall be two years, without any further qualification. The Court held that justices of the peace do not hold over by virtue of Art. II, § 13, until their successors qualify, but that they do continue as *de facto* officers until their successors are appointed and have qualified.

In the case of *Archer v. State,* 74 Md. 410, 22 Atl. 6 (1891), this Court considered the status of a State Treasurer who was elected and properly qualified, and who was later re-elected to a second term but who failed to take an oath of office and give a bond, as required by the Maryland Constitution, until his second term had almost expired. The Constitution then provided that the term of office was for two years, and until his successor should qualify. In deciding that he held over in the office, and that his original bond was liable for defalcations in the second term, until he filed the new bond, the Court said (at pages 427-428 of 74 Md.) :

> "* * * The length of the term of office seems to be accurately defined by the words of the Constitution. They are neither obscure nor ambiguous; they declare that the Treasurer's term is for two years, and until his successor shall qualify. It must be for two years at the least, and is still further to continue until the occurrence of a distinct, definite and unequivocal event. The term begins when the Treasurer qualifies, and it expires when his successor qualifies. The beginning is fixed and the end is fixed; the demarcation of its limits seems to be sufficiently clear. * * *"

It may be noted that many of the statutes creating public offices, state or local, contain similar provisions that the officers shall hold over until their successors qualify, and this is true of the Charter of North East with respect to the President and Commissioners, as stated previously in this opinion.

In *Izer v. State,* 77 Md. 110, 26 Atl. 282 (1893), this Court sustained the validity of an indictment for perjury based on an oath administered by the Deputy Clerk of the Circuit Court for Allegany County, who had continued to act as such although not reappointed or sworn in for a second term when the Clerk was re-elected. The Court stated (at page 115 of 77 Md.) :

"\* \* \* Williamson was then in the undisputed possession of the office of deputy clerk, and since 1886 had openly and notoriously discharged the duties pertaining thereto. He was at least a *de facto* officer, filling a *de jure* office, and whatever defects or irregularities there may have been in the manner of his appointment or qualification, his acts, done under color of title, are, upon grounds of public policy and necessity, valid and binding. *Norton vs. Shelby County,* 118 *U. S.,* 425. Or, as was said in *Carleton vs. The People,* 10 *Mich.,* 259: 'All that is required when there is an office, to make an officer *de facto,* is that the individual claiming the office is in possession of it, performing its duties and claiming to be such officer under color of an election or appointment, as the case may be. It is not necessary that his election or appointment be valid, for that would make him an officer *de jure.* The official acts of such persons are recognized as valid on grounds of public policy, and for the protection of those having official business to transact.' \* \* \*"

This Court has held that an elected or appointed officer may remain in office at the expiration of his term and is entitled to exercise the powers of the office until his successor qualifies, whether or not the statute creating the office so provides. As stated in *Benson v. Mellor,* 152 Md. 481, 137 Atl. 294 (1927), at pages 486, 487 and 491:

"\* \* \* And it has long been established in this state, as elsewhere, that an officer regularly holds over in office beyond the election to the qualification of his successor, because it could not be supposed that the law intended offices to be vacant after every election during the time that must necessarily elapse before the returns are canvassed, the result is certified, and the new officers are commissioned and qualified. We find the rule to be that, in the absence of an intention manifested to the contrary, all of-

ficers continue to hold their offices until they are superseded by duly commissioned and qualified successors, whether it is or is not so provided in terms in the constitution or statutes.

\* \* \* \* \* \*

"The controlling, if not the sole consideration has been that the law requires, in the public interest, that the offices be filled at all times, without interruption, and to this end the intention and understanding that incumbents shall hold until their successors qualify, has grown up and taken position as part of the law; and according to the law as it has been laid down for us, it is upon this provision or rule that dependence is placed primarily for having the offices continuously filled, *notwithstanding any delay or failure in the election of successors in ordinary course.*" (Emphasis supplied.)

*Benson v. Mellor, supra,* is cited in *Co. Comrs. v. Supervisors of Elec.,* 192 Md. 196, 208, 63 A. 2d 735 (1949), in support of the statement that "One basic rule for the construction of the Constitution is that it be not so construed as to prevent the filling of vacancies, or to create an interregnum in office." *Benson v. Mellor* was again cited with approval in *Walker v. Talbot County,* 208 Md. 72, 116 A. 2d 393 (1955), where it was held that a county commissioner serving *ex officio* as a member of the county's zoning commission, properly served as a hold-over member of the zoning commission on his re-election as county commissioner, without an additional appointment.

A comprehensive and often quoted definition of what constitutes a *de facto* officer, cited in part by Judge Markell for the Court in *Buckler v. Bowen,* 198 Md. 357, 84 A. 2d 99 (1951), is found in the leading case of *State v. Carroll,* 38 Conn. 449 (1871), and reads as follows (at pages 471-472):

"An officer *de facto* is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid so far as they in-

volve the interests of the public and third persons, where the duties of the office were exercised,

"First, without a known appointment or election, but under such circumstances of reputation or acquiescence as were calculated to induce people, without inquiry, to submit to or invoke his action, supposing him to be the officer he assumed to be.

"Second, under color of a known and valid appointment or election, but where the officer had failed to conform to some precedent requirement or condition, as to take an oath, give a bond, or the like.

"Third, under color of a known election or appointment, void because the officer was not eligible, or because there was a want of power in the electing or appointing body, or by reason of some defect or irregularity in its exercise, such ineligibility, want of power, or defect being unknown to the public.

"Fourth, under color of an election or an appointment by or pursuant to a public unconstitutional law, before the same is adjudged to be such."

It would seem beyond dispute that the above definition includes within its ambit the President and members of the Board of North East. See annotation at 71 *A.L.R.* 848. The appellant, however, seeks to exclude the officers in question by classing them as mere usurpers on the ground that they acquired office or continued therein by methods not sanctioned by law, including holding over in lieu of calling elections, appointments by Commissioners not themselves *de jure* officers, and continuing a practice of taking oaths of office before a person not qualified to give such an oath.

A usurper has been defined as one who has neither lawful title nor color of right to office, 3 McQuillin, *Municipal Corp.,* § 12.103, and the authorities are in general agreement that a mere usurper does not acquire the status of a *de facto* officer. 43 Am. Jur., *Public Officers,* § 471.

There is no evidence here, however, that the officers in question sought personal aggrandizement from their positions

on the Board, nor is this charge made. They did not discharge their offices in a secretive manner but in full view of any part of the public interested enough to desire to be informed of their actions. The record discloses that each of the Commissioners who voted for the two amendatory resolutions was either elected at least once or appointed to office, and that elections were duly held in those years in which a candidate filed for election against an incumbent. It was in the interest of economy for the Town that elections were not held when no opponents filed. No intimation of wrongful motives can be gleaned from the record. It would appear, from the passage quoted from *Benson v. Mellor, supra,* that the Commissioners' failure to hold elections each year has not eliminated their status as *de facto* officers.

As to the validity of appointments made by the Board, it is clear that a *de facto* officer may effectively appoint another *de facto* officer. As stated in 43 Am. Jur., *Public Officers,* § 481, "* * * the general rule is that when an official person or body has apparent authority to appoint to public office, and apparently exercises such authority, and the person so appointed enters on such office, and performs its duties, he will be an officer *de facto,* notwithstanding there was want of power to appoint in the body or person who professed to do so * * *." It was said in *State ex rel. Bownes v. Meehan,* 45 N. J. L. 189 (1883), that the question whether a board making an appointment was a *de facto* or a *de jure* board was unimportant in determining the status of the appointee, since a *de facto* board can exercise all the power of a *de jure* board, including the power of appointing to office.

The Maryland cases hereinbefore cited make it abundantly clear that the failure to take a proper, or any, oath of office is simply one of the factors which may reduce a *de jure* officer to the status of a *de facto* officer, and the weight of authority elsewhere is in accord. 43 Am. Jur., *Public Officers,* § 483. We therefore find it unnecessary to consider whether or not § 253 of the County Code, purporting to grant to the President the jurisdiction and power of a justice of the peace within the Town, would validly authorize him to administer oaths. Cf. *Hagerstown v. Dechert,* 32 Md. 369 (1870).

246

From what has been said it is evident that the President and Commissioners of the Town of North East were acting at least as *de facto* officers when they adopted the two resolutions amending the Charter of the Town. The Maryland cases already cited make it clear that in this State all official actions of *de facto* officers are, upon grounds of public policy and necessity, to be considered as valid and binding as if they had been performed by *de jure* officers. This Court expressly so held in *Koontz v. Burgess and Com'rs of Hancock*, 64 Md. 134, 20 Atl. 1039 (1885), where it said (at page 136 of 64 Md.) :

> "* * * no principle is better settled than that the acts of officers *de facto* in regard to public matters affecting the public interests, are to be regarded as valid and binding; as much so as if the same acts had been performed in the same manner by an officer *de jure.*"

The *Koontz* case was cited with approval in *Havre de Grace v. Fahey*, 108 Md. 533, 70 Atl. 218 (1908). See also *Hetrich v. Co. Commissioners*, 222 Md. 304, 159 A. 2d 642 (1960) ; 4 McQuillin, *Municipal Corporations,* § 13.14, and cases there cited.

The powers of *de facto* officers extend to the issuance of properly authorized bonds. While no reported Maryland case directly on point has been found, there have been decisions in other jurisdictions specifically holding that bonds duly issued and signed by *de facto* officers of a municipality were binding and valid obligations. See, for example, *Waite v. Santa Cruz*, 184 U. S. 302 (1902) ; *Humphrey v. Bd. of Com'rs of City of Pratt*, 144 P. 197 (Kan. 1914) ; *Smith v. Town of Carolina Beach*, 175 S. E. 313 (N.C. 1934) ; *Wrenn v. Town of Kure Beach*, 69 S. E. 2d 492 (N.C. 1952). Also see 15 McQuillin, *Municipal Corporations,* § 43.24.

Since the only question raised as to the first resolution, passed on November 19, 1959, was whether the Board then in office had legal power to pass it, we hold that that resolution was validly adopted and is in full force and effect as an amendment to the Charter of the Town.

### (3)

Although the President and Commissioners as *de facto* officers validly adopted the two amendatory resolutions, they did not follow the express requirement as to publication necessary to render the second resolution effective and therefore we must conclude that it is a nullity.

As noted earlier, § 2 of the second resolution specifically provides that:

> "* * * the amendment to the Charter * * * proposed by this enactment shall become effective on September 9, 1960 * * * provided * * * that a copy of the title of this resolution shall be published in 'Cecil Whig' and 'Cecil Democrat' newspapers * * * once in each of the weeks of July 27, August 3, 10 and 17, 1960."

A complete copy of the resolution was posted in the Town Hall, as required in the resolution. However, while a copy of the entire resolution was published in each of the prescribed weeks in the Cecil Democrat, no publication whatever was had in the Cecil Whig. Appellant contends that since the effectiveness of the resolution was by its own terms specifically made contingent upon publication in both newspapers, failure to publish a copy of the title in the Cecil Whig prevented the resolution from becoming effective. We agree with that contention.

The resolution expressly states its adoption "pursuant to the authority of Article XI-E of the Constitution of Maryland and § 13 of Art. 23A of the Annotated Code of Maryland (1957 Edition) * * *". Section 13, in setting out the procedure to be used by a municipal corporation in amending its charter, requires, in addition to posting in the Town Hall, that "A fair summary of the proposed amendment or amendments shall be published in *a* newspaper of general circulation in the municipal corporation * * *". (Emphasis supplied.) The resolution therefore goes beyond the requirement of the statute implementing the Municipal Home Rule Amendment by calling for publication in two newspapers. It

will be seen that the publication as actually made complied with the requirement of the statute but not with the more extensive mandate of the resolution itself. The question is, then, whether the resolution's provision as to publication is a valid enactment and, if so, whether it must be followed. A review of the authorities leads us to conclude that such enlargement on the statute by the resolution does not affect the validity of the latter or the necessity to fulfill its requirements.

The general principle applied in questions of this nature is that "* * * where municipal ordinances have been enacted in pursuance of competent authority, they should be upheld by every reasonable intendment, and reasonable doubts as to the validity of an ordinance should be resolved in its favor." *Tar Products Corp. v. Tax Comm.,* 176 Md. 290, 297, 4 A. 2d 462 (1939). See also *McBriety v. Baltimore City,* 219 Md. 223, 148 A. 2d 408 (1959).

Involved in the *Tar Products Corp.* case was an act of the General Assembly permitting tax exemption of certain property. The act provided that application should be made for such exemption before the annual revision and correction of the tax list. Baltimore City passed an ordinance requiring that application for exemption as to property covered by the act be made by September 1st. In finding no conflict between the two enactments, and thus sustaining the ordinance, this Court quoted 43 C.J. 219 and cited an earlier Maryland case as follows:

"'As a general rule, additional regulation to that of the state law does not constitute a conflict therewith. The fact that an ordinance enlarges upon the provisions of a statute by requiring more than the statute requires creates no conflict therewith.' *Rossberg v. State,* 111 Md. 394, 74 A. 581."

This case was distinguished in *Scrivner v. Baltimore,* 191 Md. 165, 60 A. 2d 190 (1948). In that case an ordinance of Baltimore City, passed under an enabling act of the General Assembly, limited the time for taking an appeal from

the Board of Zoning Appeals to the Baltimore City Court to 20 days. The enabling act itself, however, provided a 30 day period for such an appeal. The Court struck down the ordinance provision as being in direct conflict with the enabling act.

The case before us clearly seems to come within the purview of the *Tar Products Corp.* case, *supra,* and not that of *Scrivner.* The former had to do with an enlargement upon procedural regulation, while the latter case involved an attempt further to restrict a precise statutory limitation on the taking of an appeal. Publication in two newspapers, rather than in one, as in the instant case, would appear to be simply an enlargement upon procedural regulation, and a change that could reasonably be left to the determination of local authorities according to the particular needs of the community. It would seem that the provisions of Art. 23A, implementing the Municipal Home Rule Amendment, only establish minimum requirements with respect to the affairs of municipalities and that municipalities are not prohibited by the Amendment or the statute from providing such additional standards and safeguards as to them seem appropriate.

In *Murray v. Director of Planning,* 217 Md. 381, 143 A. 2d 85 (1958), where, as here, the question of conflict between a local ordinance and the general law was in issue, this Court stated (at page 389):

> "* * * a conflict exists only when a local law prohibits something permitted by the legislature, or permits something prohibited by the legislature. The Bill does neither. Furthermore, one of the purposes of 'home rule' was to afford chartered counties a certain measure of independence from the General Assembly. See *State v. Stewart,* 152 Md. 419, 422, 137 A. 39 (1927)."

The views in other jurisdictions are in general accord with what we have said here, and are set out at length in I Antieau, *Municipal Corporation Law,* § 5.20. The general principle underlying the various decisions is that complementary

municipal regulations are not struck down where they are in conformity with the plan or spirit of the State statutes. For example, see *Natural Milk Producers Ass'n v. San Francisco,* 124 P. 2d 25 (Calif. 1942) ; *City of Muskegon v. Drost,* 91 N. W. 2d 851 (Mich. 1958). See also 2 *Merrill on Notice,* § 665, where the author, dealing with the closely analogous question of the time element in published notification, states that while it is unnecessary to go beyond statutory requirements, a municipal ordinance may command additional publicity.

We feel, therefore, that the publication requirement set out in the second resolution was in general conformity with the objectives sought by § 13 of Art. 23A and hence was not invalid by reason of its enlargement upon the provisions of that section.

The wording of the resolution makes it plain that the ordinance should not take effect until properly published in the two newspapers. "Clearly, of course, where publication is made a prerequisite to the ordinance taking effect, the requirement is mandatory." 5 McQuillin, *Municipal Corporations,* § 1678. See also Yokley, *Municipal Corporations,* § 88. The reason assigned is that the requirement is one of substance, and not mere form. Cf. *Balto. & Ohio R.R. Co. v. Wright,* 198 Md. 555, 84 A. 2d 851 (1951), where a publication provision was considered directory and not mandatory, because compliance was not a *condition precedent* to the validity of the ordinance. The condition precedent element distinguishes the case before us from *Dutton v. Tawes,* 225 Md. 484, 171 A. 2d 688 (1961).

Since the mandatory provision as to publication in the second resolution was not and cannot now be complied with, the resolution never became effective and therefore is void. For this reason the order appealed from must be reversed.

(4)

While a reversal is necessary, the appellant's final contention raises a point which will be of vital importance when the second resolution is repassed, and we feel the question

should be answered in order to forestall the expense and delay of further litigation.

The contention is that the portion of the second resolution purporting to grant power to the Board to sell municipal bonds at private sale is void for conflict with public general law, specifically with § 34 (4) of Art. 23A, which provides in part:

"34. The authority conferred on municipal corporations by this subheading is subject to the following limitations:

* * *

"(4) No bonds shall be sold by a municipal corporation except by the solicitation of competitive bids at public sale after the publication in a newspaper of general circulation in the municipal corporation, and such other publication as may be specified in the enabling resolution or ordinance, of the notice of sale in the form prescribed by such resolution or ordinance by two insertions thereof over a period of not less than ten days next preceding the date fixed for such sale."

The subheading referred to in § 34 is entitled "Creation of Municipal Public Debt" and includes within its scope Sections 31 to 39. Section 31 states the general purposes of the subheading and reads in part:

"31. Every municipal corporation shall have the power under this subheading to borrow money for any proper public purpose and to evidence such borrowing by the issue and sale of its general obligation bonds in the manner herein prescribed, *unless the charter of said municipal corporation shall provide a different procedure for the borrowing of money or shall be amended so to provide in the manner set forth in this subtitle. Charter amendments for such purpose are hereby authorized. * * * Whenever there shall be any conflict between the provisions of this subheading and the charter of any municipal cor-*

*poration, the provisions of said charter shall control."* (Emphasis supplied.)

The wording of § 31 is, in our view, clear and unambiguous, and where the "language is plain and free from ambiguity, and has a definite and sensible meaning, such is *conclusively* presumed to be the meaning of the legislative body in enacting the statute or ordinance." *Stembler v. Capitol Heights,* 221 Md. 113, 117, 156 A. 2d 430 (1959). See also *Height v. State,* 225 Md. 251, 170 A. 2d 212 (1961). By most express and clear words the very first section (§ 31) under the subheading makes allowance for the situation where a municipal corporation already has or prefers to set up its own procedure for the issuance of bonds. It further states in precise terms that any conflict between "the provisions of this subheading", which definitely includes § 34, and the charter of any municipal corporation shall be resolved in favor of the charter provisions. This section is in general accord with one of the objects of the "home rule" enactments, as stated heretofore, that is, to allow subdivisions subject thereto a certain measure of independence from the General Assembly. *Murray v. Director of Planning, supra.*

The case of *Hitchins v. City of Cumberland,* 215 Md. 315, 138 A. 2d 359 (1958), relied upon by appellant, when read carefully and in its entirety, is not inconsistent with the view expressed here. In that case the Mayor and City Council of Cumberland passed an ordinance authorizing the City to issue and sell certain urban development bonds. It is manifest from a reading of the case that, in providing for this issuance and sale, the city officials intentionally followed closely the general provisions of §§ 31 to 39. Opposition to the bond issue caused delay, and the city had to pass an amendatory ordinance when the date set for the sale of bonds in the original ordinance passed without a sale being held. The amending ordinance contained no definite date for a sale of the bonds. This fact was attacked by taxpayers opposing the bond issue, who contended that the omission made the ordinance invalid, as not in conformity with § 34 of Art. 23A. In overruling this contention, this Court pointed out that "a

date of sale must be fixed as a necessary preliminary to the competitive bidding, *which sec. 34 plainly requires*. But it does not follow that the date must be fixed in advance of a referendum the result of which is still uncertain." (Emphasis supplied.) The appellant points to the italicized words to support his view that the provisions of § 34, providing for a public sale, must be complied with in every case by a municipal corporation. However, it is clear from the case that Cumberland's own ordinance paralleled § 34 with respect to the issuance and sale of its bonds. Hence § 31, making it possible for a municipality to fix its own procedure, which would prevail over the procedure set out in the subheading, was of no importance in that case, and indeed was not construed therein.

The instant case, however, provides a different situation, for here the Town of North East has chosen to provide for its own method of issuing and selling the bonds involved, and this action is plainly permitted by the provisions of § 31. When the sections comprising the subheading are read as a whole, no other interpretation seems possible, in light of the plain words used by the Legislature. Hence, in our view, the provision in the second resolution allowing a private sale of bonds would have been valid and in conformity with the general intent of the Legislature.

One other point must be noted. The learned chancellor in holding for the appellees stated that, since he found the resolutions amending the Charter valid in all respects and in full force and effect, a declaratory decree so stating was unnecessary. However, this Court, in *Shapiro v. County Comm.*, 219 Md. 298, 149 A. 2d 396 (1959), in a comparable situation, stated at page 302:

> "* * * Where a bill of complaint shows a subject matter that is within the contemplation of the relief afforded by the declaratory decree statute, and it states sufficient facts to show the existence of the subject matter and the dispute with reference thereto, upon which the court may exercise its declaratory power, it is immaterial that the ultimate ruling

> may be unfavorable to the plaintiff. The test of the sufficiency of the bill is not whether it shows that the plaintiff is entitled to the declaration of rights or interest in accordance with his theory, but whether he is entitled to a declaration at all; so, even though the plaintiff may be on the losing side of the dispute, if he states the existence of a controversy which should be settled, he states a cause of suit for a declaratory decree. 1 Anderson, *Declaratory Judgments,* Section 318."

There is no question but that the petition of the appellant in the trial court met all of the above tests and requirements, and that a declaratory decree setting forth the rights of all parties should have been rendered. See also *John B. Robeson Associates, Inc. v. Gardens of Faith, Inc.,* 226 Md. 215, 172 A. 2d 529.

For the reasons set forth in this opinion, the order of the trial court must be reversed.

> *Order reversed; case remanded for the passage of a decree declaring the rights of the parties in conformity with this opinion. Costs to be paid by appellees.*