# MUNICIPALITIES

CHARTER AMENDMENT PROCESS – PREEMPTION – A MUNICIPALITY MAY NOT REQUIRE THAT ALL CHARTER AMENDMENTS GO THROUGH AN ADVISORY REFERENDUM BEFORE BEING CONSIDERED BY THE LEGISLATIVE BODY

July 31, 2017

*The Honorable Patrick Wojahn*
*Mayor, City of College Park*

You have asked whether the Council of the City of College Park may amend the City Charter to require that all future charter amendments be subject to a non-binding referendum before the Council may vote on adopting the amendment. In keeping with our procedures for addressing local governments' opinion requests, you provided the City Attorney's analysis of the question. Noting that no Maryland law explicitly prohibits a municipality's use of an advisory referendum for a charter amendment, the City Attorney advised that a supportable argument could be made that the City may adopt the requirement that you describe.

In our opinion, the State statutes that prescribe the process for amending municipal charters do not permit municipalities to require an advisory referendum as an additional step in that process. Therefore, the City may not condition the commencement of the charter amendment process on the submission of the proposed amendment to the City's electorate for what amounts to a straw vote.

## I

## Background

### A.  *The History of the Proposal*

Currently, the City's charter provision on referenda addresses only binding referenda. That provision requires the Mayor and Council ("Council") to submit the issuance of bonds to a binding referendum and authorizes the Council "to place other items, except Charter amendment resolutions, to automatic and binding referendum by a majority vote of said Council." City Charter of College Park ("Charter") § C4-9. With respect to referenda on charter amendments, the Charter currently incorporates by reference the process stated in Title 4, Subtitle 3 of the Local Government Article of the Maryland Code. *See* Charter § C5-1.

3

Title 4 of the Local Government Article provides two methods of adopting charter amendments: A "legislative" method, by which the city council itself enacts the amendment by resolution, Md. Code Ann. Local Gov't § 4-304,[1] and the "petition" method, where the charter amendment is initiated by the voters directly, § 4-305. *See also* Md. Const., Art. XI-E, § 4. Your opinion request arises out of a proposal that the City change the legislative method of amending the Charter. The proposed change would add a preliminary step to that method: Before adopting a resolution to amend the charter, the Council would have to submit the amendment to the City's electorate in an advisory referendum, commonly referred to as a "straw vote." The straw-vote requirement would apply only to charter amendment resolutions; it would not apply to other types of resolutions that the Council might consider.

A similar proposal was part of a bill introduced in the 2015 session of the General Assembly. That bill, House Bill 682, would have authorized municipalities to amend their charters to permit the legislative body to submit a proposed charter amendment to a referendum. The bill also would have changed the petition method by allowing a municipality to lower the threshold for petitioning a resolution to referendum, and for initiating an amendment by petition, from 20% to as low as 5%.

In response to a question about the Legislature's authority regarding municipal charter amendments, our Office advised that the General Assembly could amend the statute to allow a municipality to require a binding referendum on its charter amendments and to alter the petition thresholds as proposed. Letter from Kathryn M. Rowe, Assistant Attorney General, to Del. Joseline A. Peña-Melnyk (Feb. 5, 2015). The letter cautioned, however, that the authorization in State law must apply to all municipalities equally to satisfy the constitutional directive that "general laws . . . shall in their terms and in their effect apply alike to all municipal corporations . . . ." Md. Const., Art. XI-E, § 1. The advice letter also noted that, while the Legislature may change the law, "municipalities [are] not free to make their own rules" for adopting charter amendments. Rowe Letter at 2 (citing *Hitchins v. City of Cumberland*, 208 Md. 134, 143 (1955)).

As explained by the bill's sponsor, the bill arose out of College Park's particular demographic circumstances. *See* 2015

---

[1] All references are to the Maryland Code Annotated, Local Government Article (2013, 2016 Supp.), unless otherwise noted.

Leg., Reg. Sess., Hearing Before the House Environmental and Transportation Committee on H.B. 682 (written testimony of Del. Joseline A. Peña-Melnyk, March 3, 2015). Delegate Peña-Melnyk testified that, because a significant number of College Park's registered voters are former students who have since left the City, it is harder for petitioners in College Park to meet the 20% signature threshold than it is for residents in municipalities with less transient populations. *Id.* Also, many of the current student voters reside in dormitories and other restricted-access housing, which makes it difficult to obtain their signatures in petition drives. *Id.* Together, these two conditions limit the effectiveness of the petition process as a check on legislatively-adopted charter amendments. *Id.*

The Maryland Municipal League (MML) opposed the bill. In its testimony, MML testified that the 20% threshold worked well for municipalities generally, and that the law should not be changed to accommodate one locality. *See* 2015 Leg., Reg. Sess., Hearing Before the House Environmental and Transportation Committee on H.B. 682 (testimony of Candace Donoho, Director, Govt'l Relations, March 3, 2015). The bill did not make it out of committee, and the statutory procedures for amending a municipal charter remained unchanged.

### B. *The Legislative Method for Amending Municipal Charters*

The Maryland Constitution provides for the adoption and amendment of a municipal charter by either the legislative method or the petition method. *See* Md. Const., Art. XI-E, § 4. The same section requires the General Assembly to "amplify the provisions" of Article XI-E by general law. *Id.* The General Assembly has done so for both methods. *See*, *e.g.*, § 4-304 (legislative method); § 4-305 (petition method); § 4-307 (referendum on amendments proposed by either method). Only the legislative method is relevant to your inquiry.

The legislative method is "amplified"—and regulated—by various sections in Title 4, subtitle 3, of the Local Government Article. Section 4-304 prescribes the first step: the municipal governing body's adoption of a resolution to initiate a charter amendment. Under § 4-304(a), local governments are authorized to adopt charter amendment resolutions "in the same manner as other resolutions in the municipality by a majority of all the individuals

elected to the legislative body."[2]   Section 4-303 regulates the formatting and contents of the resolution.  Among other things, the resolution must "contain the exact text of the proposed charter amendment, prepared so that each provision is shown as the provision would read when amended or enacted," § 4-303(a)(1), must be numbered in a certain way, *id*., (c), and must indicate the changes in certain typefaces, *id*., (e).

The second step in the legislative method of adopting charter amendments is the provision of a 40-day notice period during which the municipality's voters may seek a referendum on the proposed amendment.  Once the local governing body adopts the resolution, the municipality's chief executive officer must post the resolution in the "main municipal building" for 40 days and publish it four times during that period, at weekly intervals, in a newspaper of general circulation.  § 4-304(b).

The third step depends on whether the legislative body receives a petition for a referendum on the proposed amendment.  If no one files a petition on or before the 40th day after adoption, the amendment takes effect on the 50th day after the adoption of the resolution, and the next steps relate merely to codification and reports to the Department of Legislative Services.  §§ 4-304(c), 4-308 through 310; *see also Hitchins*, 208 Md. at 142 (stating that the resolution becomes part of the charter unless a referendum vote is demanded); *Blackwell v. City of Seat Pleasant*, 94 Md. App. 393, 398-99 (1993) (explaining the process).  If, instead, the legislative body receives a timely petition for referendum that is signed by at least 20% of the qualified voters for the municipality's general election, the legislative body must "specify by resolution" the date of a referendum. § 4-304(d)(5). The referendum may be scheduled for either the next municipal general election or a special election held "not less than 40 days or more than 60 days after the resolution scheduling the referendum is adopted." *Id*., (d)(6).  Whether or not the proposed amendment is petitioned to referendum, the governing body may not rescind the proposal "in any manner except by another charter amendment."  § 4-306.

---

[2]   Before recodification into the Local Government Article, this provision read: "The legislative body . . . may initiate a proposed amendment . . . by a resolution which, except as otherwise specified in this subtitle, is ordained or passed as in the usual course of considering resolutions in the government of the municipal corporation." Md. Ann. Code, Art. 23A, § 13(a) (2011 Repl. Vol.).

## II

## Analysis

Article XI-E of the Constitution, the "municipal home rule amendment," permits municipalities to govern themselves in local matters. *See Clough v. Mayor & Council of Hurlock*, 445 Md. 364, 369 (2015) (describing the grant of home rule to municipalities); *Inlet Associates v. Assateague House Condominium Ass'n.*, 313 Md. 413, 425 (1988) (same). Specifically, residents of an area may elect to incorporate a municipality under a charter, Art. XI-E, §§ 3, 4, which then serves as "the organic, the fundamental law, establishing basic principles governing relationships between the government and the people, and among the various governmental branches and bodies." *Clough*, 445 Md. at 369 (quoting *Cheeks v. Cedlair Corp.*, 287 Md. 595, 607 (1980)); *see also* 88 *Opinions of the Attorney General* 103, 109-11 (2003) (explaining municipal home rule); 80 *Opinions of the Attorney General* 227, 229 (1995) (same).

Still, municipalities, like counties, "are but local divisions of the State." *Rockville v. Randolph*, 267 Md. 56, 62 (1972). As creations of the State, municipalities possess only the powers that the State has granted to them—expressly or impliedly—through the Maryland Constitution or the enactments of the General Assembly. *See Kent Island Def. League*, *LLC v. Queen Anne's County Bd. of Elections*, 145 Md. App. 684, 688-89 (2002) (explaining the State's grant of powers to municipalities); *Town of La Plata v. Faison-Rosewick*, *LLC*, 434 Md. 496, 523 (2013) (noting the implicit authority to carry out "'fairly implied' powers incident to those duties or authority expressly granted" (citation omitted)). Even when a municipality enacts a law or charter provision on a subject within its delegated powers, that provision is subject to laws enacted by the General Assembly. *See* Md. Const., Art. XI-E, § 6 (providing generally that "[a]ll charter provisions, or amendments thereto, adopted under the provisions of this Article, shall be subject to all applicable laws enacted by the General Assembly"); *see also Allied Vending*, *Inc. v. City of Bowie*, 332 Md. 279, 295 (1993) (explaining the constitutional limits on municipal powers).

Your question, therefore, raises two issues: whether the charter amendment process is a subject that falls within a broad category of powers that municipalities may address in their charters; and, if so, whether the addition of a straw-vote requirement to that process would be preempted by State statute.

The first issue does not pose an obstacle to the proposed straw vote requirement; the second does.

### A.    *Whether the Proposed Procedure Falls Within a Category of Powers that a Municipality May Address in Its Charter*

The Maryland Constitution expressly authorizes municipalities to adopt charters, and charter amendments, that address the "incorporation, organization, government, or affairs" of the municipality.  Md. Const., Art. XI-E, § 3; *Birge v. Town of Easton*, 274 Md. 635, 644-45 (1975).  The courts have interpreted Article XI-E, § 3 to allow home-rule jurisdictions to address *only* those matters in their charters; the basic function of a home-rule jurisdiction's charter is not to legislate, but to "distribute power among the various agencies of government, and between the government and the people who have delegated that power to their government."  *Save Our Streets v. Mitchell*, 357 Md. 237, 248 (2000) (internal quotation marks omitted); *see also Mayor & City Council of Ocean City v. Bunting*, 168 Md. App. 134, 147 (2006) ("[A]n amendment to a charter 'is necessarily limited in substance to amending the form or structure of government initially established by adoption of the charter.'" (quoting *Cheeks*, 287 Md. at 607)).

For example, the Court of Appeals held that a proposal to create a rent-control system was legislative in nature and thus not "charter material."  *Cheeks*, 287 Md. at 614; *see also Save Our Streets*, 357 Md. at 255 (holding that proposed amendment to prohibit the use of county funds for speed bumps was not charter material).  Permissible municipal charter provisions, on the other hand, have included debt and tax-rate limits, *Woelfel v. Mayor and Aldermen of Annapolis*, 209 Md. 314, 318-19 (1956), terms of office and term limits, *Town of Glenarden v. Bromery*, 257 Md. 19, 25 (1970), and authorization for a municipal utility to provide telecommunication services, 88 *Opinions of the Attorney General* at 111; *see also* 88 *Opinions of the Attorney General* 156, 160 n.6 (2003) (providing examples of permissible and impermissible charter amendments).

The proposed change in College Park's charter amendment procedure addresses a subject within its municipal powers and qualifies as charter material.  That is, the proposed addition of a step to the charter amendment process would relate to "the organization, government, or affairs" of the municipality, as authorized by Article XI-E, § 3 of the Maryland Constitution.  Also, the change would be structural, not legislative, and therefore would be proper material for a charter, as opposed to an ordinance.

This result does not end the analysis, however. Instead, we must now turn to whether the provisions of the Local Government Article preempt the proposed change.

### B. Whether the Proposed Procedure Would Conflict with, or Otherwise Be Preempted by, State Law

The Maryland Constitution expressly makes "[a]ll charter provisions, or amendments thereto . . . subject to all applicable laws enacted by the General Assembly." Md. Const., Art. XI-E, § 6. Put another way, any conflict between a municipal charter provision and State law must be resolved in favor of the State law. *See Hitchins*, 208 Md. at 143 (holding that State statutes superseded city charter provisions).

The preemption doctrine "is grounded upon the authority of the General Assembly to reserve for itself exclusive dominion over an entire field of legislative concern." *Ad+Soil, Inc. v. County Commissioners*, 307 Md. 307, 324 (1986). Under the doctrine of preemption, "legislative acts by a local jurisdiction that conflict with a public general law or that deal with an area in which the General Assembly has occupied the entire field or which deal with an area that the General Assembly has expressly reserved to itself, are invalid." *Kent Island Def. League*, 145 Md. App. at 689. Therefore, the courts look to whether the Legislature intended to retain, delegate, or share its power to regulate the field in which the activity falls. *See Ad+Soil*, 307 Md. at 324-26.

State law may preempt local law in one of three ways: (1) preemption by conflict, (2) express preemption, or (3) implied preemption. *Altadis U.S.A., Inc. v. Prince George's County*, 431 Md. 307, 311 (2013); *Allied Vending*, 332 Md. at 297-98. As noted by the City Attorney, there is no express conflict between the proposed advisory referendum procedure and State law; the applicable State statutes do not expressly prohibit, or even mention, advisory referenda on proposed charter amendments. *Compare Montgomery County v. Atlantic Guns, Inc.*, 302 Md. 540, 543 (1985) (finding express preemption when uncodified language stated that "the State of Maryland hereby preempts the right of the political subdivisions to regulate" the wearing, carrying, or transporting of handguns) *with Ad+Soil*, 307 Md. at 324 (finding no express preemption where State statute contained no "language prohibiting local legislation"). Instead, we evaluate whether local legislation on the charter amendment process is preempted by implication or by conflict.

### 1.    Implied Preemption by Occupation of the Field

Implied preemption occurs when "local law deals with an area in which the State Legislature has acted with such force that an intent by the State to occupy the entire field must be implied." *Talbot County v. Skipper*, 329 Md. 481, 488 (1993) (internal quotation marks and brackets omitted). Although there is no set formula for divining legislative intent, "the primary indicia of a legislative purpose to preempt an entire field of law is the comprehensiveness with which the General Assembly has legislated in the field." *Id.* (internal quotation marks omitted). The fact that the General Assembly has legislated on a particular subject, however, does not invariably preclude all local regulation of a field.   Dual regulatory processes may co-exist when local regulation augments, and does not conflict with, the State's regulation. *See*, *e.g.*, *Maryland Reclamation Associates v. Harford County*, 414 Md. 1, 40 (2010) (holding that State waste disposal permitting process complemented, rather than preempted, the county's planning and zoning role); *Mayor & City Council of Baltimore v. Hart*, 395 Md. 394, 409 (2006) (holding that city directive on the operation of emergency vehicles was not preempted by State statute because the directive and the statute furthered the same purpose).

The Court of Appeals—noting the considerable detail with which the General Assembly has legislated on the topic—has concluded that the State has entirely occupied the field with respect to the charter amendment process, and, therefore, that State statutes supersede a local government's efforts to alter that process. *Hitchins*, 208 Md. at 144; *see also Mayor of City of Hagerstown v. Lyon*, 236 Md. 222, 228 (1964); *Blackwell*, 94 Md. App. at 400; 74 *Opinions of the Attorney General* 183, 184-85 (1989); 58 *Opinions of the Attorney General* 153, 156 (1973).   In *Hitchins*, the Cumberland city charter had required a referendum on every charter amendment initiated by the legislative route and had permitted the initiation of amendments by a petition of 10% of the city's voters.   208 Md. at 139.   Then, as now, State law did not require a referendum on a legislatively-adopted charter amendment unless at least 20% of a municipality's qualified voters so petitioned, and a petition of at least 20% of the voters was needed to initiate an amendment.   *Id*. at 141-42; *see also* §§ 4-304, 4-305.   Holding that State law preempted these charter provisions, the Court stated that it was "clear" that the State laws "enacted to implement Article XI-E, and particularly to implement Section 4 thereof, occupy the whole field of amendments to charters of municipalities." *Hitchins*, 208 Md. at 143.

In *Lyon*, a mayor claimed that charter amendments initiated by the legislative method were ordinances, subject to his veto, rather than resolutions, which were not. The Court concluded, with "no great difficulty," that the question was "controlled by the State law . . . and not by the provisions of the [city charter] dealing generally with the passage of ordinances." 236 Md. at 228, 229. Similarly, in *Blackwell*, the Court of Special Appeals held that an amendment initiated by the legislative method was rendered "inoperative" when the municipality posted notice of the governing body's resolution *after* the stated effective date of the amendment and after the voters' right to petition it to referendum had expired. 94 Md. App. at 406-07.

At the same time, the Court has declined to invalidate charter amendments for "literal" noncompliance with State law when there is no evidence that the legislative body or the electorate was misled. Thus, in *Lyon*, the Court upheld the validity of a legislatively-adopted charter amendment in which the *entirety* of the amended provision—old and new language alike—appeared in italics, rather than just "the new matter," as State law required. 236 Md. at 232-33. The Court noted that neither the legislators nor the voters could have been confused by the "failure to comply literally" with State law. To invalidate the amendment on the basis of technical noncompliance with State law, the Court observed, would "place a premium on form and require a disregard of substance." *Id*. at 234.

Likewise, the Court has stated that municipal officials may administer the process with "additional standards and safeguards," such as requiring that notice be posted in ways additional to that required by the statute. *See Reed v. Town of North East*, 226 Md. 229, 249 (1961). In *Reed*, the Court concluded that the requirement in § 4-304(b)(2) that a charter amendment resolution be posted in "a newspaper" did not preempt local legislation requiring resolutions to be posted in *two* newspapers, because the measure "would appear to be simply an enlargement upon procedural regulation." *Id*. The Court found the "enlargement" in *Reed* to be analogous to a local measure that had permissibly set a date certain—September 1—for an application-filing deadline, when State law required only that the application be filed before the annual revision of the tax list. 226 Md. at 248-49 (discussing *Eastern Tar Products Corp. v. State Tax Comm.*, 176 Md. 290 (1939)).

Here, the proposed advisory referendum requirement would not merely deviate from an administrative aspect of the State law and would not simply enlarge upon an existing procedural

regulation. Instead, it would substantively alter College Park's method of adopting charter amendment resolutions by creating a new procedure for those resolutions alone. In so doing, the advisory referendum would limit the City Council's discretion to address a charter amendment resolution at any time. We therefore conclude that State law would impliedly preempt an advisory referendum requirement for charter amendments.

## 2. Conflict Preemption Under Article XI-E, § 6

We also conclude that the proposed charter amendment process would be preempted by conflict. Preemption by conflict occurs when a local ordinance "either prohibits an act that under State law is permitted, or it permits an act that under State law is prohibited." *Worton Creek Marina*, *LLC v. Claggett*, 381 Md. 499, 515 (2004). As we have previously advised, courts will infer the Legislature's intent to displace local regulation either from "a verbal conflict" (*i.e.*, when the language of the State and local law are in conflict) or from a "functional conflict" (*i.e.*, when the impact of the local law interferes with the State law's function). *Hart*, 395 Md. at 408-09; *see generally* 98 *Opinions of the Attorney General* 60, 91 (2013).

There is no verbal conflict here; the applicable State statutes do not expressly prohibit advisory referenda on proposed charter amendments. There is, however, a functional conflict. We see two areas of conflict.

First, under the State-law procedures, municipal governing bodies must adopt charter amendment resolutions "in the same manner as other resolutions in the municipality by a majority of all of the individuals elected to the legislative body." § 4-304(a). Under the proposed amendment, as we understand it, College Park would adopt charter amendment resolutions in a manner different from that used for other resolutions: For charter amendment resolutions alone, the City Council would first have to submit the proposed change to the electorate for an advisory vote.[3]

---

[3] For discussions about whether a charter home-rule county may hold straw votes, *see Montgomery County v. Bd. of Supervisors of Elections*, 311 Md. 512, 521-22 (1988); 61 *Opinions of the Attorney General* 384 (1976) (General Assembly authorization needed); 61 *Opinions of the Attorney General* 391, 395-97 (1976) (expressing "serious doubt" about submitting a charter resolution to referendum

Second, the addition of an extra step at the beginning of the charter amendment procedure significantly alters the schedule that § 4-304 sets for the adoption of charter amendments. Although the Court of Appeals has not addressed changes in the statutory schedule for charter amendments, it has addressed the subject in the context of the somewhat analogous procedures for petitioning a municipal annexation resolution to referendum. *See Koste v. Town of Oxford*, 431 Md. 14, 33-34 (2013); *see also Town of New Mkt. Frederick County v. Milrey*, *Inc.-FDI P'ship*, 90 Md. App. 528, 542-44, 547-48 (1992) (referring to *Hitchins* and *Lyon* in analyzing town's compliance with the statutory annexation procedures).

The annexation procedures at issue in *Koste*, like the charter amendment procedures here, prescribed the steps to be followed and the time periods for the governing body's adoption of a resolution and provision of notice. In that case, the annexation resolution would take effect forty-five days after the governing body's adoption of it, unless the requisite number of voters had petitioned it to referendum within that 45-day period. 431 Md. at 21-22. Some of the *Koste* petitioners had signed the petition *before* the town commissioners had adopted the resolution. When the commissioners rejected those signatures and refused to refer the

---

when the effect of the particular referendum would be that of a "straw vote"). In *Montgomery County*, the Court broadly stated "the principle that 'straw votes' are impermissible in this State." 311 Md. at 521 (citing *Levering v. Supervisors of Elections of Baltimore City*, 129 Md. 335, 338-40 (1916)). Relying on *Levering*, the Court reasoned, in part, that general election ballots would be overcrowded with questions. *Id.* at 522.

Whether that principle applies to municipalities, which did not have home rule when *Levering* was decided, is unclear. We have previously noted that the authority of municipalities to allocate powers between their governing bodies and their voters is likely broader than that of counties, because Article XI-E does not require municipalities to delegate legislative authority exclusively to the governing body. *See* 88 *Opinions of the Attorney General* 156, 161-62 (2003). And, in contrast to the applicable law when *Levering* was decided, the law now contains a mechanism for guarding against overcrowding the State ballot with local questions. The State Board of Elections now has the opportunity to review and approve municipal ballot questions before they appear on the State ballot. *See* § 4-108.3 (providing for inclusion of municipal questions on the State ballot under certain circumstances). It is, thus, no longer necessary to prohibit straw votes altogether, at least not to prevent overcrowding of the State ballot.

resolution to referendum, a voter sought a judicial determination that the signatures were valid. *Id*. at 17-18. The Court held that the signatures were not valid, and it concluded that "[t]he General Assembly intended for the post-enactment forty-five (45) day period to act as a beginning and ending period for the petition circulation and submission process." *Id*. at 36. The Court explained:

> The General Assembly, in imposing substantial requirements and restrictions on the referendum process generally, was mindful of the legitimate concern that legislative governance could be slowed down dramatically if referendum elections were too frequent occurrences. If referendum elections were to become a more routine occurrence, it would take substantially longer and exhaust substantially more resources for laws to become enacted (if at all), thus stagnating potentially the legislative process. *See* [*Mayor and Town Council of Oakland v. Mayor and Town Council of Mountain Lake Park*, 392 Md. 301, 332 (2006)] ("[I]f the petition is accomplished appropriately and defended during the signature verification process, there remains a very costly and time consuming political process leading up to the referendum election.") (Cathell, J. concurring). Consequently, when the General Assembly intends to impose a substantial restriction on the referendum process, that purpose will not be disturbed by the Judiciary, except upon the clearest justification and grounds.

*Koste*, 431 Md. at 33-34.

Here, State law sets a timetable that begins with the governing body's resolution proposing the charter amendment and ends with the adoption of the amendment. Specifically, the municipality must publish the resolution "for the 40 days after the resolution is adopted"; any petition for referendum must be filed within that 40-day period; and, absent a sufficient petition, the amendment will take effect on the 50th day after the resolution is adopted. § 4-304(b), (c). Beginning the charter amendment process with a straw vote would delay the adoption of the resolution well beyond the 50-day period contemplated by the statute.

For this reason, the addition of a non-binding referendum to the charter amendment process is not the sort of variance from State law that the Court of Appeals has upheld on the grounds that it merely "enlarges upon" a State statute "by requiring more than the statute requires." *Reed*, 226 Md. at 248. The local measures upheld on this ground performed the same function as a correlative State-law provision but did so by requiring additional or more specific steps not required by State law. In *Reed*, for example, the Court upheld a local requirement that charter amendments be published in *two* newspapers even though State law required only one. And, in *Eastern Tar Products*, the Court declined to invalidate a local requirement that an application for tax exemption be submitted by a date certain rather than "before the annual revision and correction of the tax lists," as State law had required. 176 Md. at 294.

A requirement that a municipal legislative body submit all proposed charter amendments to a non-binding referendum does not "enlarge" upon any goal of the charter amendment process set forth in State law. Instead, it would significantly disrupt the schedule set forth in State law, lead to frequent advisory referenda, and delay the governing body's enactment of charter amendments, perhaps significantly. We thus conclude that a local measure requiring a mandatory straw vote before the municipal legislative body can vote on a charter amendment would be preempted, both by conflict and by the General Assembly's implied occupation of the field of the charter amendment process.

## III

### Conclusion

In our opinion, an amendment of the City Charter mandating an advisory referendum before the City Council may vote on a charter amendment resolution would be preempted by the State law that establishes the process for adopting municipal charter amendments. Only if the applicable State statutes were amended to permit the advisory referendum and to create the process for its implementation could the City Council establish this prerequisite to amending its charter.

Brian E. Frosh
Attorney General of Maryland

Karen L. Federman Henry
Assistant Attorney General

Adam D. Snyder
Chief Counsel, Opinions & Advice