## THE MAYOR AND ALDERMEN OF THE CITY OF ANNAPOLIS ET AL. *v.* ANNAPOLIS WATER-FRONT COMPANY ET AL.

[No. 6, September Term, 1978.]

*Decided January 24, 1979.*

---

384

*Eugene M. Lerner, City Attorney,* and *Richard G. Anderson, Assistant City Attorney,* for appellants.

*Ronald A. Baradel,* with whom were *Hartman & Crain* on the brief, for appellees.

COLE, J., delivered the opinion of the Court.

The seeds of this controversy were sown when the General Assembly enacted Chapter 26 of the Laws of Maryland of 1785 which vested in the Port Wardens of the City of Annapolis the power and responsibility to regulate the construction of wharves in the port of that city. Chapter 26 provided that the Port Wardens were to determine and regulate all matters relating to (1) the erection or building of wharves in the port, (2) the distances the wharves extended into the water, and (3) the materials of which the wharves were to be constructed and the manner and form of such construction, always keeping in view the preservation of the navigation of said port. It provided that a failure to procure a license from the Wardens prior to construction of a wharf

would be punishable by a fine. It also provided a right of appeal to the Mayor and Aldermen by any citizen aggrieved by the decision of the Port Wardens.

These provisions were incorporated into the city charter as Sections 36 through 40 inclusive and remained unchanged until the City amended its charter in 1970 allowing the Wardens to consider in deciding whether to issue a license "the effect of the proposed wharf and its uses on marine life, wildlife, conservation, water pollution and erosion." [1]

In 1974, the General Assembly (by Chapter 835 of the Laws of Maryland of 1974) amended Maryland Code (1957, 1973

---

1. Sections 38, 39, and 40 are the pertinent sections for consideration in this case.

"*Sec. 38. [Port Wardens] — Powers generally.*

The wardens, or a majority of them, shall have power to determine upon and regulate all matters relating to the creation or building of wharves in the said port, so far as respects the distance said wharves may be extended into the water, and the materials of which they shall be constructed, and the manner and form of construction, keeping in view the preservation of the navigation of said port *and the effect of the proposed wharf and its uses alone or in concert with existing wharves and their uses on marine life, wildlife, conservation, water pollution and erosion,* by not permitting any wharf to be carried out in such manner as to render the navigation of the same too close and confined, or to be built of such materials or constructed in such manner as may be deemed not sufficiently substantial and lasting, *or to materially increase water pollution or erosion, or materially impair marine life, wildlife, or conservation.*" [Emphasis supplied *to show changes from prior wording.*]

"*Sec. 39. Same — License to build wharf, etc.*

No person holding lands on the waters of said port, nor any person whatever, shall build any wharf, or carry out any earth or other material for that purpose without license from said wardens, or a majority of them, to do the same; and if any person shall offend against the provisions of this section, or if any person shall build any wharf a greater distance into the waters of said port, or in a different form, or of different materials than determined and allowed by the wardens, or a majority of them, he shall be subject to such fine as the mayor and aldermen may obtain. (P.L.L., 1888, art. 2, § 44; 1914 Code, § 47.)"

"*Sec. 40. Same — Appeals to mayor and aldermen.*

In all differences that shall arise between any citizen of Annapolis and the said wardens, touching the discharge of their duty, an appeal *de novo* shall lie to the mayor and aldermen. Appeal must be filed in writing with the city clerk within thirty days of the final decision of the said port wardens. (P.L.L., 1888, art. 2, § 45; 1914 Code, § 48; Char. Am. No. 3, § 1.)"

Repl. Vol.), Article 23A, § 2, dealing with the authority of municipal corporations. By that Act, the Legislature added subsection 23A to Article 23A, § 2 [2] which encompassed the pre-1970 authority of the Port Wardens as set forth in the charter of the City of Annapolis but did not include the language of the 1970 charter amendment.

This was the state of the law on February 6, 1975 when the Annapolis Waterfront Company (the Company) applied to the Port Wardens of the City of Annapolis (the Wardens) for permission to build 42 additional [3] slips for The Point Condominium (the Point). A public hearing was held before the Wardens on December 10, 1975. On January 14, 1976 the Wardens denied the application by a unanimous decision, on the grounds that the proposed improvements would create pollution in Spa Creek, adjoining the Point; that the project

---

**2.** (23A) *Port Wardens.* To provide for the creation and appointment of a board of port wardens to exercise jurisdiction within the limits of the municipal corporation.

(i) The wardens, or a majority of them, may determine and regulate all matters relating to the erection or building of wharves and mooring buoys or flotation wharves in the port, so far as respects the distance wharves, mooring buoys or floating wharves may be extended into the water and the materials of which they shall be constructed and the manner and form of construction. The wardens shall always consider the preservation of the navigation of the port by not permitting any wharf mooring buoys or floating wharf to be carried out in such a manner as to render the navigation of the port too close and confined or to be built of such materials or constructed in such a manner as may be deemed not sufficiently substantial and lasting.

(ii) No person may build any wharf, or carry out any earth or other material for the purpose of building a wharf, nor shall any persons place or erect mooring buoys or floating piers without a license from the port wardens. If any person violates the provisions of this section, or if any person builds any wharf a greater distance into the waters of the port, or in a different form, or of different materials than determined and allowed by the wardens, he is subject to a fine as imposed by the legislative body of the municipal corporation.

(iii) In all differences that arise between any citizen of any municipal corporation and the port wardens of that municipal corporation concerning the discharge of the duties of the port wardens, an appeal may be taken to the legislative body of the municipal corporation. These provisions . . . contain the full extent of the powers granted to Port Wardens under State law . . . .

**3.** In November, 1971, the Mayor and Aldermen of the City of Annapolis had approved the construction of 42 slips for the Point owned by the Company with the right to apply for an additional 42 slips when construction of all 100 units in the condominium had been completed.

would result in more congested navigation; and that there would be an adverse effect on traffic conditions in the area of the Eastport Bridge.

The Company and the Council of Unit Owners of the Point (Council)[4] then appealed to the Mayor and Aldermen, pursuant to § 40 of the Annapolis City Charter. The Mayor and Aldermen held a *de novo* hearing on February 17, 1976. At that hearing the Company and Council offered the following testimony. Mr. Paul N. Pearson testified that the slips should be constructed to stop erosion on the shoreline near the Point. Mr. Richard McClelland testified that the proposed slips would not interfere with navigation and would not cause hazards for boat traffic, citing a 1975 United States Army Corps of Engineers Report on Spa Creek, which was then introduced into evidence. McClelland also was of the opinion that there was a great demand among unit owners for additional slips. Mr. C. Godfrey Garvey, Mr. Steven Kaplan, and Mr. William J. Smith, Jr., owners of condominium units in the Point, spoke in favor of the additional slips. The Company and Council also introduced into evidence certain documents relating to the Wardens' decision and the plans for construction of the additional slips.

Several people then spoke in opposition to the project. Mr. Malcolm Smith, counsel for the opposition, questioned the number of unit owners who really wanted boats. He argued that there were still vacancies among the slips already constructed at the Point and that additions would further congest Spa Creek. Captain Thomas M. Adams testified that he had made a statistical study of boat ownership in three residential complexes in Annapolis, which showed that 42 slips already in existence were sufficient to accommodate the Point. Representatives of Annapolis community groups stated that their members opposed the project. Several unaffiliated property owners concurred in this position.

4. The Council of Unit Owners of The Point Condominium is an unincorporated body set up pursuant to the requirements of the Maryland Horizontal Property Act, for the purpose of administering and managing the common elements and facilities of the condominium, which includes waterfront facilities and boat slips.

At their regular meeting on March 8, 1976, the Mayor and Aldermen adopted Resolution R-11-76, which denied the application and affirmed the Wardens' decision. The Resolution contained certain findings of fact: that "no sufficient evidence was produced at the hearing to show that the piers will be built of such materials or constructed in such manner as may be deemed substantial and lasting"; that "the forty-two ... slips would add to the already congested situation in Spa Creek", that pollution in the creek would increase; and that emergency vehicles travelling over the Eastport Bridge would be hindered by the additional waiting time necessary to permit the additional boats on the creek to move past the bridge.

The Company and the Council then filed a bill of complaint in the Circuit Court for Anne Arundel County, praying for a mandatory injunction ordering the Mayor and Aldermen to grant the permits necessary for the construction of the additional 42 slips.

The circuit court, after making certain preliminary rulings, held that the provisions which grant powers to the Wardens under state law are in conflict with the powers conferred upon the Wardens under the Annapolis City Charter and that the general grant of power from the state to municipalities under Article 23A, § 2 did not authorize the city to expand upon the specific powers given the Wardens by the State. The court concluded that as to construction materials, navigation and, partly, traffic conditions, there was *no evidence* to support the findings of the Mayor and Aldermen; and that as to pollution and, partly, traffic conditions, there was "no substantial evidence" to support their findings. Therefore, the circuit court held that the actions of the Mayor and Aldermen were "arbitrary, capricious and unsupported by any competent supporting evidence." It granted the injunction.

The Mayor and Aldermen then appealed to the Court of Special Appeals, which affirmed the decision of the circuit court in an unreported per curiam opinion issued on January 26, 1978. We granted certiorari to review the circuit court's conclusion that the Wardens had no power to consider environmental effects of the proposed construction and to

determine whether the circuit court was correct in ruling that there was no evidence to support their findings and no substantial evidence to support the denial of permission to construct the additional 42 slips.

According to § 3 of Article XI-E of the Constitution of Maryland, adopted in 1954:

> Any ... municipal corporation, now existing or hereafter created, shall have the power and authority, (a) to amend or repeal an existing charter or local laws relating to the incorporation, organization, government, or affairs of said municipal corporation heretofore enacted by the General Assembly of Maryland, . . . .

The Mayor and Aldermen contend that § 3 of Art. XI-E thus enables the City of Annapolis to amend its charter as it relates to local government or affairs. They further contend Article 23A of the Code, enacted to implement the constitutional amendment, only established minimum requirements with respect to the operation of municipal corporations and thus does not prohibit them from establishing additional charter standards and safeguards in furtherance of the authority already delegated. They urge us to hold that the circuit court was in error as a matter of law.

On the other hand, the Company contends that Article 23A, § 2 of the Code conflicts with § 38 of the charter, as amended in 1970, and that the charter provision must yield to a state statute on the same subject. Neither party challenges the power of the City of Annapolis to amend its charter pursuant to Article XI-E, § 3 of the Maryland Constitution. *See generally* Moser, *County Home Rule—Sharing the State's Legislative Power with Maryland Counties,* 28 Md. L. Rev. 327, 334-36 (1968). Rather, the Company argues that since the 1974 enactment of Article 23A, § 2 (23A) did not specifically empower the Wardens to consider environmental factors, the Mayor and Aldermen's decision in this case is a nullity because § 38 of the charter, as amended, which allowed consideration of such factors, was in conflict with subsection (23A) and was superseded by the state statute.

Several decisions of this Court have examined alleged conflicts between local and state laws, recognizing that one of the purposes of "home rule" was to allow local areas some independence in deciding questions of local concern, *see City of Baltimore v. Sitnick & Firey,* 254 Md. 303, 255 A. 2d 376 (1969); *State v. Stewart,* 152 Md. 419, 137 A. 39 (1927). This Court has adhered to the rule of construction that when municipal ordinances are "enacted in pursuance of competent authority, they should be upheld by every reasonable intendment, and reasonable doubts as to the validity of an ordinance should be resolved in its favor." *Tar Products Corp. v. Tax Commn.,* 176 Md. 290, 297, 4 A. 2d 462 (1939). The established principle of law in this state is that:

> [O]rdinances which assume directly or indirectly to permit acts or occupations which the State statutes prohibit, or to prohibit acts permitted by statute or Constitution, are under the familiar rule for validity of ordinances uniformly declared to be null and void. Additional regulation by the ordinance does not render it void. [*Rossberg v. State,* 111 Md. 394, 74 A. 581 (1909).]

We have, accordingly, ruled that "a conflict exists only when a local law prohibits something permitted by the legislature, or permits something prohibited by the legislature." *Murray v. Director of Planning,* 217 Md. 381, 389, 143 A. 2d 85 (1958). *Accord, County Council v. Montgomery Ass'n,* 274 Md. 52, 57-58, 333 A. 2d 596 (1975); *City of Baltimore v. Sitnick & Firey, supra,* 254 Md. at 311-14; *Reed v. Pres. of North East,* 226 Md. 229, 172 A. 2d 536 (1961); *Tar Products Corp. v. Tax Commn., supra,* 176 Md. at 296. *See also* other cases cited in *City of Baltimore v. Sitnick & Firey, supra,* 254 Md. at 314. In other circumstances, the state may permit municipalities to exercise concurrent regulatory authority.

When we examine the facts before us, there are several reasons why there is no conflict between § 38 of the charter as amended, and subsection 23A of the Code. First, § 38, as amended, does not prohibit something that subsection 23A permits, as would be the case if, for example, the city charter

prohibited the Wardens from considering the preservation of the navigation of the port, or if the charter forbade the Wardens from regulating the construction of wharves and buoys in the port. Nor does § 38, as amended, permit the Wardens to do something prohibited by the General Assembly; for subsection 23A, does not specifically prohibit the Wardens from doing anything. It merely sets forth their powers and affirmative standards for the exercise of those powers. The purpose of both subsection 23A of the Code, and § 38 of the charter is to allow the Wardens to regulate construction on waterways.

As we see it, the 1970 amendment of § 38 of the charter merely permitted additional regulation of the construction of wharves and piers in Annapolis, consistent with the purpose of subsection 23A. As such, this case is analogous to *Rossberg v. State, supra,* in which a municipal ordinance imposing greater penalties for possession or sale of cocaine than a state statute prohibiting the same acts was upheld as not repugnant to the state law; *Tar Products Corp. v. Tax Commn., supra,* where a city ordinance requiring applications for a tax exemption to be filed at a particular date, not later than the time for revision and correction of tax lists was held valid, while the state law prescribed that such applications be filed by the time for revision, but not at a particular date; and *Reed v. Pres. of North East, supra,* in which we upheld a municipal resolution requiring changes in the town charter to be published in two newspapers, when a state statute only required publication in one newspaper. All the amendment to § 38 did was to add another factor which the Wardens were to consider in reaching their decision. As we stated in *Reed v. Pres. of North East, supra,* 226 Md. at 249-50: "The general principle underlying the various decisions is that complementary municipal regulations are not struck down where they are in conformity with the plan or spirit of the State statutes."

A second reason why there is no conflict between subsection 23A of the Code and § 38 of the charter, as amended, is that subsection 23A does not prescribe the exclusive means by which the Wardens can make decisions.

Article 23A, implementing Article XI-E, § 3, only establishes *minimum requirements* regarding municipal affairs. Municipalities are free to provide for additional standards and safeguards in harmony with concurrent state legislation. *See Reed v. Pres. of North East, supra,* 226 Md. at 249. *See also County Council v. Montgomery Ass'n, supra.*

Finally, we observe that the language of subsection 23A does not forcefully express any legislative intent to occupy a specific field of regulation and thus preempt municipal action in the same area. The General Assembly is presumed to be aware of the law in existence at the time a bill is enacted. *See McCarthy v. Bd. of Education of A.A. Co.,* 280 Md. 634, 374 A. 2d 1135 (1977); *County Council v. Montgomery Ass'n,* 274 Md. 52, 333 A. 2d 596 (1975); *City of Baltimore v. Sitnick & Firey, supra,* 254 Md. at 322; *Planning Comm. v. Silkor Corp.,* 246 Md. 516, 524-25, 229 A. 2d 135 (1967). Since the General Assembly created the Port Wardens of the City of Annapolis in 1785 and did not choose to legislate again on that subject until 1974, and must be deemed aware of the 1970 amendment to § 38 of the charter, we can only conclude that if the state did not wish to permit the Wardens to consider environmental factors, it would have expressly prohibited such action in 1974 in the language of subsection 23A.

For these reasons, then, we hold that there is no conflict between subsection 23A of the Maryland Code and § 38 of the Annapolis City Charter, as amended in 1970. The circuit court erred in its analysis of this issue.

Having concluded that the Mayor and Aldermen could consider environmental effects of the proposed construction at the Point, we turn our attention to the second issue, whether the circuit court erred in holding that the decision of the Mayor and Aldermen was arbitrary and capricious. The Mayor and Aldermen insist that there was substantial evidence in the record to support their decision. They state that since the evidence before them made the issues of navigation, construction materials and pollution "fairly debatable," the circuit court should not have substituted its judgment for theirs. The Company replies that there was no evidence presented to show that the construction materials

would not be durable, that the proposed piers would impair navigation, or that the environment would be adversely affected by the project.[5]

Many opinions of this Court and contributions of distinguished scholars have discussed judicial review of administrative decision-making in Maryland. *See generally Dickinson-Tidewater v. Supervisor,* 273 Md. 245, 255-56, 329 A. 2d 18 (1974); *Heaps v. Cobb,* 185 Md. 372, 378-81, 45 A. 2d 73 (1945); *Hecht v. Crook,* 184 Md. 271, 280-81, 40 A. 2d 673 (1945); Cohen, *Some Aspects of Maryland Administrative Law,* 24 Md. L. Rev. 1 (1964); Oppenheimer, *Administrative Law in Maryland,* 2 Md. L. Rev. 185 (1938); Tomlinson, *Constitutional Limits on the Decisional Powers of Courts and Administrative Agencies in Maryland,* 35 Md. L. Rev. 414 (1976). Administrative agencies, such as we have here, are arms of the legislature and derive all their authority from the legislative branch. *Dal Maso v. County Commrs.,* 182 Md. 200, 205, 34 A. 2d 464 (1943). This right of the legislature to delegate some of its powers to a municipal corporation has long been recognized by this Court. *See, e.g., Rossberg v. State,* 111 Md. 394, 74 A. 581 (1909). Thus, where a municipal legislative body has enacted a zoning ordinance under powers granted by the General Assembly, a presumption of validity attaches to that act as an exercise of the police power. *Eckes v. Board of Zoning Appeals,* 209 Md. 432, 437, 121 A. 2d 249 (1956); *Wakefield v. Kraft,* 202 Md. 136, 96 A. 2d 27 (1953); R. Anderson, *American Law of Zoning and Planning,* § 25.26 (2d ed. 1977); 2 A. Rathkopf, *The Law of Zoning and Planning,* §§ 21.01 -.02 (1957, 1978 Supp.). Further, we have held that courts of this state are without power to interfere with "any exercise of the legislative prerogative within constitutional limits, or with the lawful exercise of administrative authority or discretion." However, such administrative discretion does

---

5. The Company also contends that the Mayor and Aldermen's denial of the permits was arbitrary because one alderman switched his vote on the second roll call vote on the question. This contention is without merit. Before a measure has been officially adopted or rejected, no third party rights vest in the action of a municipality. A municipality is also free to reconsider its actions at a later date and rescind a measure previously enacted or adopt a position previously rejected if no rights have vested. *See* Dal Maso v. County Commrs., 182 Md. 200, 34 A. 2d 464 (1943).

not go unchecked. The judicial branch of the government ordinarily may, through appeal, the writ of mandamus, by injunction, or otherwise, correct any abuse of discretion by administrative agencies or review their actions when arbitrary, illegal, capricious or unreasonable. *Heaps v. Cobb, supra,* 185 Md. at 379; *Dickinson-Tidewater v. Supervisor, supra,* 273 Md. at 255; *Hecht v. Crook, supra,* 184 Md. at 280-81. However, the scope of judicial review of decisions by administrative agencies is narrow, recognizing that board members have expertise in a particular area and ordinarily should be free to exercise their discretion as such. *Finney v. Halle,* 241 Md. 224, 216 A. 2d 530 (1966). Accordingly, this Court adheres to the proposition that a reviewing court will not substitute its judgment for that of an administrative board [6] where the issue is fairly debatable and the record contains substantial evidence supporting the administrative decision. *E.g., Mont. Co. v. Woodward & Lothrop,* 280 Md. 686, 376 A. 2d 483 (1977), *cert. denied sub nom. Funger v. Montgomery Co.,* 434 U. S. 1067 (1978); *Agneslane, Inc. v. Lucas,* 247 Md. 612, 233 A. 2d 757 (1967). *See also Heath v. M. & C.C. of Baltimore,* 187 Md. 296, 49 A. 2d 799 (1946); Oppenheimer, *supra,* at 209.

When reviewing an administrative decision for arbitrariness or capriciousness, a court must first determine whether the question before the agency was fairly debatable.[7] In *Eger v. Stone,* 253 Md. 533, 542, 253 A. 2d 372 (1969), we defined the term "fairly debatable":

> We have made it quite clear that if the issue before the administrative body is "fairly debatable", that is,

---

6. Where municipal officials, such as the Mayor and Aldermen of the City of Annapolis, must pass upon applications for new construction, they are actually placed in the same status as a formal board of zoning appeals, Oppenheimer, Administrative Law in Maryland, 2 Md. L. Rev. 185 (1938), at 194; therefore, our review of the Mayor and Aldermen's denial of permission to construct additional slips at the Point will employ the standards generally applicable to judicial review of decisions of zoning boards.

7. A plethora of decisions of this Court have endorsed the "fairly debatable" test. The most recent cases include Mont. Co. v. Woodward & Lothrop, 280 Md. 686, 376 A. 2d 483 (1977), *cert. denied,* sub nom. Funger v. Mont. Co., 434 U. S. 1067 (1978); Rockville v. Stone, 271 Md. 655, 319 A. 2d 536 (1974); Trainer v. Lipchin, 269 Md. 667, 309 A. 2d 471 (1973); Zengerle v. Bd. of Co. Comm'rs, 262 Md. 1, 276 A. 2d 646 (1971).

*that its determination involved testimony from which a reasonable man could come to different conclusions,* the courts will not substitute their judgment for that of the administrative body, in the absence of an unconstitutional taking of private property for public use without the payment of just compensation. *Brouillett v. Eudowood Shopping Plaza, Inc.,* 249 Md. 606, 241 A. 2d 404 (1968); *Creative Country Day School, Inc. v. Montgomery County Board of Appeals,* 242 Md. 552, 219 A. 2d 789 (1966); *County Council for Montgomery County v. Gendleman,* 227 Md. 491, 177 A. 2d 687 (1962). [emphasis supplied.]

Other courts employ this test. *See, e.g., Zahn v. Bd. of Public Works,* 274 U. S. 325, 47 S. Ct. 594, 71 L. Ed. 1074 (1927); *Aldridge v. Grund,* 293 Ala. 333, 302 So. 2d 847 (1974), *appeal dismissed,* 421 U. S. 1007 (1975); *City of Long Beach v. California Lambda Chapter,* 255 Cal. App. 789, 63 Cal. Rptr. 419 (1967); *Hanna v. Rathje,* 171 N.W.2d 876 (Iowa 1969). Professor Rathkopf interprets the term to mean "a matter of opinion." A. Rathkopf, *supra,* § 21.05. The Supreme Court of Alabama explained the term this way:

So here, the question is: Was there presented to the Commission a debatable issue as to whether or not the rezoning was for the purpose of promoting health, safety, morals, or the general welfare of the county? If it was, then the court ought not to interfere in the matter.

In *Cudd v. City of Homewood,* 284 Ala. 268, 271, 224 So.2d 625, we said:

The word "debatable" means, "Liable to be debated; disputable; subject to controversy or contention; open to question or dispute." Webster's New International Dictionary, 2d Ed. (Unabridged). * * * [293 Ala. at 342.]

In this case the Circuit Court for Anne Arundel County did not even consider whether the issues before the Mayor and Aldermen were fairly debatable upon reviewing their actions.

Consequently, we are compelled to reverse the decision of the circuit court. While the issue is before us, however, we shall proceed to resolve this question.

Whether an issue before an administrative agency is fairly debatable is an individualized determination based on the record evidence of each case. Applying the test in *Eger v. Stone, supra,* we are convinced that there was evidence in the administrative record concerning the environmental effects of the construction of additional slips which made this issue fairly debatable. On the side of the Company, McClelland testified regarding navigation; portions of the Army Corps of Engineers report on Spa Creek navigation and pollution were also considered by the agency. Among the evidence in opposition to the project was a portion of the Corps of Engineers report and testimony by Malcolm Smith and by representatives of Annapolis community organizations to the effect that navigation in Spa Creek would be impaired and pollution increased. Therefore, we can only conclude that the Mayor and Aldermen were presented with evidence from which a reasonable man could draw different conclusions. These issues were, at the very least, debated and subject to controversy. It was for the administrative body, in the exercise of its discretion, to weigh the evidence before it. The circuit court erred in substituting its judgment for that of the Mayor and Aldermen.

Where the scope of review is not specified by statute, a corollary element in judicial review of administrative decisions for arbitrariness is a determination of whether the findings of the board were supported by substantial evidence: [8]

> While a court reviewing a decision of a board . . . may not substitute its judgment for that of the

---

8. As we said in Insurance Comm'r v. Nat'l Bureau, 248 Md. 292, 309, 236 A. 2d 282 (1967), while there are differences in the formulations, both tests are designed to correct arbitrary administrative action:

> Whichever of the recognized tests the court uses—substantiality of the evidence on the record as a whole . . . [or] . . . fairly debatable . . . — its appraisal or evaluation must be of the agency's fact-finding results and not an independent original estimate of or decision on the evidence. The required process is

board, it will examine the record upon which the board's decision is based to determine whether the findings of the board are supported by substantial evidence. The scope of this judicial inquiry is commonly described in the orthodox terminology of the substantial evidence rule. [R. Anderson, *supra*, § 25.27, at 269-70 (footnotes omitted).]

*See, e.g., Dickinson-Tidewater v. Supervisor, supra; Port Wardens v. Md. Cap. Yacht Club,* 261 Md. 48, 273 A. 2d 102 (1971); *Snowden v. Mayor & C.C. of Balto.,* 224 Md. 443, 168 A. 2d 390 (1961); *Heath v. M. & C.C. of Baltimore, supra.* We have defined the "substantial evidence test" as "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached," *Insurance Comm'r v. Nat'l Bureau,* 248 Md. 292, 309, 236 A. 2d 282 (1967), or as " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' " *Bulluck v. Pelham Apts.* 283 Md. 505, 390 A. 2d 1119 (1978); *Snowden v. Mayor & C.C. of Balto., supra,* 224 Md. at 448. *See also* C. McCormick, *Evidence,* § 352 (2d ed. 1972). This review should not consist of judicial fact-finding or a substitution of judicial judgment for agency judgment. *Insurance Comm'r v. Nat'l Bureau, supra,* 248 Md. at 309-10. Professor Davis analyzed the substantial evidence rule as follows:

The heart of the fact-finding process often is the drawing of inferences from the evidence. A fact finder may draw inferences from the words or gestures or inflections or demeanor of a particular witness, may infer a particular basic fact from the testimony of one or more witnesses on one side or on both sides, and may infer an ultimate fact from

difficult to precisely articulate but it is plain that it requires restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions under any of the tests, all of which are similar. There are differences but they are slight and under ... [either] ... of the standards the judicial review essentially should be limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached.

undisputed basic facts or from an entire record of conflicting evidence . . . .

The question for the reviewing court is . . . whether the conclusions "reasonably may be based upon the facts proven." The court may not substitute its judgment on the question whether the inference drawn is the right one or whether a different inference would be better supported. The test is reasonableness, not rightness. [4 K. Davis, *Administrative Law,* § 29.05, at 137, 139 (1958).]

Another commentator presented the following illustration of the operation of the rule:

[A]ssume that in an agency hearing five witnesses testify on one side of a proposition, and one witness testifies on the other. In its findings, the agency states that it does not doubt the credibility of any of the witnesses, but that it is relying on the testimony of the one witness and disregarding that of the five. Under the substantial evidence rule, a court would be required to uphold such findings. [Cohen, *supra,* at 38.]

When we examine the record in this case, we find ample evidence by which a reasoning mind reasonably could have reached the conclusion that construction of an additional 42 slips at the Point would have adverse environmental ramifications. The Corps of Engineers study indicates that turbidity of the water in Spa Creek will increase during construction of piers, decreasing light penetration and affecting photosynthesis. The water will become enriched with nitrogen and phosphorus, leading to algal blooms and increased eutrophication of the creek. Construction along the creek will reduce the amount of permeable soil and increase the amounts of surface runoff water. Increasing numbers of boats will result in additional discharge of waste products, according to the report. There was testimony by several area residents that additional slip construction would further congest navigation on the creek. We cannot say that a reasoning mind reasonably might not have accepted this

evidence as adequate to support the conclusion that possible adverse effects of the additional construction outweighed the benefits from the project. Therefore, we are of the opinion that there was substantial evidence in the record to support the Mayor and Aldermen's conclusions. The circuit court plainly erred in substituting its judgment.

Since the Mayor and Aldermen could consider the environmental effects of the proposed construction because there is no conflict between § 38 of the Annapolis City Charter, as amended in 1970, and Article 23A, § 2 (23A) of the Maryland Code, because the issue was fairly debatable, and because there was substantial evidence to support the Mayor and Aldermen's denial of the construction permits, we reverse the judgment of the Court of Special Appeals.

> *Judgment of the Court of Special Appeals reversed; remanded to that court with instructions to reverse the decree of the Circuit Court for Anne Arundel County and to remand to that court with instructions to enter a decree consistent with the views expressed herein.*
> *Costs to be paid by appellees.*