JOHN H. MEARS, JR. *v.* TOWN OF OXFORD

[No. 1542, September Term, 1981.]

*Decided September 7, 1982.*

408

The cause was argued before GILBERT, C. J., and MOORE and MACDANIEL, JJ.

*Warren K. Rich,* with whom were *Stephen P. Kling* and *Niles, Barton & Wilmer* on the brief, for appellant.

*David R. Thompson* and *Thomas T. Alspach,* with whom were *Goldsborough, Franch & Collett* on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

This appeal tests the validity of an ordinance that established a Board of Port Wardens,[1] pursuant to Art. 23A § 2 (23A), Md. Ann. Code (1981 Repl. Vol.), in the historic and picturesque town of Oxford, Maryland. The appellant urges error by the Circuit Court for Talbot County (Clark, J.) in:

1) failing to find that Ordinance 165, which regulates wharf construction in municipal waters, was an abuse of police power as applied to him;

2) holding that Section 3, Clause 3, unconstitutionally limited commercial marina expansion, but was severable from the rest of Ordinance 165; and

3) upholding the validity of Ordinance 165 on a motion for summary judgment.

If none of these arguments prevails, appellant contends that the ordinance still cannot properly be applied to his proposed marina expansion.

We find that Ordinance 165 is a valid exercise of legisla-

---

* Note: *Certiorari* denied, Court of Appeals of Maryland, November 22, 1982.

1. Annapolis, the capital of Maryland, has had a Board of Port Wardens since 1785, four years before the State Constitution was written. Originally, the wardens were to regulate wharf construction in the port city. In 1970, the City amended its charter to allow the wardens to consider environmental effects in deciding whether to issue construction licenses. *See* Mayor of Annapolis v. Annapolis Waterfront Co., 284 Md. 383, 392, 396 A.2d 1080 (1979).

tive power by the municipal government of Oxford, that the offending clause 3 is severable, that summary judgment was proper, and that appellant's proposed expansion is subject to the regulatory powers of the Board of Port Wardens. Accordingly, for the reasons stated herein, we shall affirm.

## I

Appellant, John H. Mears, Jr., purchased the marina, called Mears Yacht Haven, in March 1978. The property is located in Town Creek at Oxford, Talbot County, and is within a "C-3 Maritime Commercial District." The marina consisted of 80 spaces for mooring boats, known as "slips," plus storage and parking areas. In April 1978, Mr. Mears applied to the U.S. Army Corps of Engineers for permission to build 88 additional slips.[2] After some informal discussion with Oxford planning officials, Mr. Mears submitted a second scaled-down plan for 47 slips in October 1978. The next month, the Town Commissioners voted to oppose the revised application and sent notice of their disapproval to the Corps. Undaunted and still anxious to compromise, Mr. Mears tried again; he submitted another revised plan for 38 slips to the Corps. On April 25, 1979, the Town Commissioners voted to oppose this revision. Sensing that the Commissioners would not favor any expansion, Mr. Mears amended his fourth application to 68 new slips, which was also opposed by the Commissioners.[3]

---

**2.** The U.S. Army Corps of Engineers issues a permit authorizing construction work in navigable waters, pursuant to the River and Harbor Act of 1899, § 10, 33 U.S.C. § 403 (1976). Among the stated conditions is that the permit does not infringe upon any federal, state, or local laws or regulations, "nor does it obviate the requirement to obtain State or local assent required by law for the activity authorized herein."

**3.** The Commissioners' opposition was based on the "channel-ward" expansion proposed by Mr. Mears, that is, his proposed piers would extend further toward the navigable channel delineated by the U.S. Army Corps of Engineers' map than existing piers. Fletcher Hanks, elected commissioner in 1979, said in a deposition that he opposed any encroachment toward the channel from the present dockline because of potential navigational difficulties. Mr. Mears' real problem, according to several opponents, was that silting had made many of his existing slips too shallow to accommodate larger sailboats.

On September 29, 1979, the Commissioners adopted an emergency moratorium on all marina expansion for 10 months. On October 14, 1979, the Commissioners adopted Ordinance 165, which tracks the language of Art. 23A § 2 (23A) (Enumeration of express powers — Port Wardens) except for clause 3; it prohibited any expansion of a commercial marina beyond a line formed by existing structures.[4]

Mr. Mears challenged the constitutionality of this provision and Ordinance 165 in a petition for declaratory judgment, filed on March 26, 1980. The town of Oxford demurred on the ground that Mr. Mears had not applied for any permit pursuant to the town's zoning laws or Ordinance 165 and, thus, had not exhausted administrative remedies. The demurrer was overruled on June 19, 1980. Subsequently, both sides filed motions for summary judgment.[5]

After two hearings, the court ruled on August 21, 1981, that clause 3 was "an unconstitutional exercise of the police power in that it is so vague as to violate [appellant's] right to due process of law and is so arbitrary as to result in an invidious discrimination, all in violation of the Fourteenth Amendment to the United States Constitution."

The court also held that clause 3 was severable, leaving Ordinance 165 intact and valid, and granted summary judg-

---

4. The language of Section 3, Clause 3, sought to limit expansion to a hypothetical line, presumably across Shipyard Cove, drawn from the most channel-ward existing structure as reflected in charts by the U.S. Army Corps of Engineers. The imprecision of such a line proved the constitutional undoing of the clause, which stated:

> "3. In no case shall the Board of Port Wardens grant any permit or license construction in or of a commercial marina which would extend the area of such marina available for water based boat storage beyond the area within the lines formed by existing structures within the water of the municipality as reflected upon current U.S. Army Corps of Engineers' charts."

5. In his motion for summary judgment, Mr. Mears asserted that Ordinance 165 was invalid as an improper exercise of the police power and as an ultra vires act in excess of and contrary to delegated authority in addition to being void for vagueness. He also stated that the port wardens [in weighing adverse environmental impacts] were precluded from reconsidering the State's water quality certification, and from making any determination about navigability contrary to the findings of the U.S. Corps of Engineers.

ment to the town of Oxford on Counts I through VI and XI of the declaration.[6] Only Counts I, relating to substantive due process, and II, relating to "special laws" are contested on appeal, as well as the issue of severability.

## II

Neither party challenges the court's ruling that Section 3, Clause 3, of Ordinance 165 is unconstitutional. From appel-

---

**6.** In his written decision, Judge Clark summarized the eleven counts in the declaration as follows:

Count I claims that Ordinance No. 165 violates Mears' rights to substantive due process under the Fourteenth Amendment because the ordinance was adopted solely to injure a single party and has no reasonable relation to the public health, safety or welfare.

Count II states that the ordinance and its enabling legislation are invalid under the Maryland Constitution as special laws.

Count III says that Oxford is pre-empted by the State from making any determination as to water quality.

Counts IV, V, and VI assert that the U.S. Army Corps of Engineers has exclusive authority over matters of navigation and any attempt by the town of Oxford to regulate matters of navigation are void.

Count VII argues that Section 3, Clause 3, of the ordinance is void due to vagueness because it refers to certain charts that do not exist.

Count VIII states that in the same Clause 3, Oxford exceeded the authority granted by the State enabling legislation and [the clause is invalid as an *ultra vires* act.]

Count IX asserts that Clause 3 violates the equal protection clause of the Fourteenth Amendment as it creates an arbitrary distinction between commercial and non-commercial marinas.

In Count X Mears contends that Clause 3 denies him the procedural due process guaranteed by the Fourteenth Amendment because it does not provide for a hearing to test the limitations therein, thus creating an unreasonable irrebuttable presumption.

Count XI asserts that the regulations promulgated pursuant to Ordinance No. 165 are invalid in that they attempt to extend the jurisdiction of the port wardens beyond the town waters, attempt to regulate the pre-empted matters of water quality and navigation, and for the reasons set forth in Counts IV through X.

Counts VII and IX were decided in favor of Mr. Mears. The court did not consider the issue in Count VIII in view of its preceding findings. The court granted summary judgment to the town of Oxford on Counts I (by its own motion pursuant to Md. Rule 610(d)(1)) through VI and XI. Appellant abandoned Count X (procedural due process) in oral argument below.

lant's point of view, however, that clause cannot be severed because it constitutes the "dominant aim of the whole statute," *Mayor of Baltimore v. A.S. Abell Co.,* 218 Md. 273, 290, 145 A.2d 111 (1958), in that the Commissioners would not have enacted the whole if they had known clause 3 was invalid. *Board of Public Works v. Baltimore County,* 288 Md. 678, 683, 421 A.2d 588 (1980). Thus, appellant urges, the whole intent of enacting Ordinance 165 was to prevent Mr. Mears from expanding his marina,[7] not to set up a rational scheme for management of Town Creek.

The plain language of Ordinance 165 [8] belies this factual argument. As Judge Clark pointed out in his opinion below,

---

7. In early 1979, one other application for expansion was pending but had been approved by the time the Commissioners adopted the 10-month moratorium in late September. According to the Commissioner Emory Balderson's deposition, several other marinas in Oxford had applied for and/or been granted permission to expand in the two and a half years preceding the moratorium and ordinance. Mr. Balderson stated that the history of this expansion "had a lot to do with our decision" to impose the moratorium because "we were rapidly approaching [the limits of] moderate expansion."

8. The ordinance, minus Section 3, Clause 3, reads as follows:

"BE IT ENACTED BY THE COMMISSIONERS OF OXFORD, pursuant to Section 10 of the Charter of the Town of Oxford, and pursuant to Article 23A § 2 (23A), of the Annotated Code of Maryland, as follows:

SECTION 1: There is hereby created the Board of Port Wardens for the Town of Oxford, which Board shall consist of three (3) members appointed by the Commissioners of Oxford, for terms of one (1) year each, provided however, that the initial terms of each member shall be one (1) year, two (2) years, and three (3) years, respectively, as designated by the Commission.

SECTION 2: The Board of Port Wardens shall hold public meetings at least once every month.

SECTION 3: The Board of Port Wardens shall have the following powers, duties, and responsibilities:

    1. To regulate the placement, erection, or construction of structures or other barriers within or on the waters of the municipality, including but not limited to the issuing of licenses to create or build wharves or piers and the issuing of permits for mooring piles, floating wharves, buoys, or anchors, taking into account the present and proposed uses, and the effect of present and proposed uses on marine life, wildlife, conservation, water pollution, erosion, navigational hazards, the effect of the proposed use on congestion within the waters, the effect on other riparian property owners, and the present and projected needs for any proposed commercial or industrial use.

    2. The port wardens shall have the power to regulate the materials and constructions for the aforesaid improvements and to make certain that any improvements in the waters within the

the Board of Port Wardens has power to "regulate the placement, erection, or construction of structures or other barriers within or on the waters of the municipality," taking into account the effects this development may have on those waters. Through the ordinance the town would gain control over the uses of one of the town's major assets. Thus, the board could exercise the regulatory powers delegated by the State to a municipal corporation through Art. 23A § 2 (23A).

Further, Ordinance 165 contains a severability clause, *see* n.8, Section 8, which creates a presumption that any portion of a statute can be invalidated without affecting the rest.

---

municipality do not render the navigation too close and confined. This provision in no way intends to affect or conflict with any zoning power otherwise provided for.

3. *See* n.4, *supra*.

SECTION 4: No person may build any wharf or pier, or carry out any earth or other material for the purpose of building a wharf or pier, nor shall any person place or erect mooring piles, floating wharves, buoys, or anchors without a license or permit from the port wardens. If any person violates the provisions of this section, or if any person builds any wharf or pier a greater distance into the waters of the port, or in a different form, or of different materials than determined and allowed by the wardens, he is subject to a fine as hereinafter imposed.

SECTION 5: The Board of Port Wardens may adopt such reasonable rules and regulations, including permit or license fees, as it deems necessary for the conduct of its business; provided, however, that all such rules, regulations, and fees shall be approved by the Commissioners of Oxford.

SECTION 6: Violation of any provision of this Ordinance shall be a municipal infraction as described in Article 23A, § 3, Annotated Code of Maryland, and a fine of $100.00 shall be imposed for each conviction hereunder. Each day in violation shall be considered a separate offense and subject to separate citations. A fine of $200.00 shall be imposed for each repeat offense.

SECTION 7: In all differences that arise between any aggrieved party and the port wardens concerning the discharge of the duties of the port wardens, an appeal may be taken to the Commissioners of Oxford.

SECTION 8: AND BE IT FURTHER ENACTED, That if any provision of this Ordinance or the application thereof to any person or circumstance is held invalid for any reason, such invalidity shall not affect the other provisions or any other application of this Ordinance which can be given effect without the invalid provisions or application, and to this end, all the provisions of this Ordinance are hereby declared to be severable.

SECTION 9: This Ordinance shall be effective upon its adoption by the Commissioners of Oxford."

It is settled beyond cavil that alleged wrongful motives or improper purposes are no basis for striking down an otherwise constitutional statute. United States v. O'Brien, 391 U.S. 367, 383-4 (1968); *see* Montgomery County Council v. Dist. Land Corp., 274 Md. 691, 337 A.2d 712 (1975).

*Sanza v. Maryland Board of Censors,* 245 Md. 319, 338, 226 A.2d 317 (1967). The purpose of such a clause is to manifest a legislative body's intent that if any part of the enactment is declared invalid, the body would still have enacted the remainder. *Casey Development Corp. v. Montgomery County,* 212 Md. 138, 148, 129 A.2d 63 (1957). A severability clause should be given effect whenever the legislative intent can be carried out minus the invalid portion. *Anne Arundel County v. Moushabek,* 269 Md. 419, 430, 306 A.2d 517 (1973). The court must look to what would have been the intent of the legislative body if it had known that its enactment could be only partially effective. *O.C. Taxpayers for Equal Rights, Inc. v. Mayor of Ocean City,* 280 Md. 585, 600, 375 A.2d 541 (1977).

As the lower court observed, the fact that Mr. Mears was the only applicant for marina expansion when the ordinance was enacted indicates that his plans forcefully focused the town's attention on the scope of potential development, with its attendant consequences, of Town Creek. Judge Clark stated:

> "If the intent were solely to stop Mears, the enactment of an expansion limitation like that in Section 3, Clause 3, would have been sufficient. But the fact that the town enacted the whole ordinance and appointed a Board of Port Wardens clearly indicates a motive to give the local citizens a means to affect the uses of a local public asset."

Even if Mr. Mears is the only riparian owner affected by the ordinance, that fact does not necessarily amount to a due process violation. In *Goldblatt v. Town of Hempstead,* 369 U.S. 590 (1962), the Court rejected a due process challenge to a zoning ordinance that prohibited the further operation of a gravel pit in Hempstead, Long Island, thereby depriving the owner of the property's most beneficial use. Even though the ordinance seemed aimed solely at the appellants who ran the only gravel pit operation in the town, the ordinance was upheld as a proper exercise of the police power. *Id.* at 596.

The Court stated: "Indulging in the usual presumption of constitutionality, we find no indication that the prohibitory effect of [the ordinance] is sufficient to render it an unconstitutional taking. . . ." *Id.* at 594. *See Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138 (1980).

Appellant argues that since Section 3, Clause 3, was the only portion of Ordinance 165 not copied verbatim from Art. 23A § 2 (23A), the "unavoidable inference" is that the Town's only purpose in creating the port wardens was to establish a mechanism to stop Mr. Mears' expansion. Further, the Town had the right to create a Board of Port Wardens for decades, but never did so until Mr. Mears came along. Thus, the Commissioners would not have enacted Ordinance 165 if they had known clause 3 was invalid because their "personal biases" and the absence of any supporting evidence that expansion would harm Town Creek belie any intent of harbor management, according to appellant.

However, an equally fair inference is that the Commissioners were trying to set up a "Maginot Line," in Town Creek to prevent any channel-ward expansion and preserve the existing "open space" for the use of the public. *See* n.3, *supra.* Clause 3, although void for vagueness, is in harmony with the intent of the ordinance and does not negate "the dominant aim of the whole statute." *Abell, supra,* 218 Md. at 290.

### III

Absent the offending Clause 3, Ordinance 165 must still pass constitutional muster. Appellant argues that the ordinance is an improper exercise of police power because its enactment (1) was motivated by a plebiscite of protest, (2) was not a "rational action reasonably related to the advancement of the general welfare," and (3) constituted impermissible and improper special legislation.

First, appellant fails to distinguish between comprehensive municipal legislation, which treats all property

owners alike, and decisions that restrict or expand the property rights of specific individuals or the permitted uses of specific parcels of land. The distinction was delineated in *Benner v. Tribbitt,* 190 Md. 6, 20, 57 A.2d 346 (1948):

> "On purely public or political questions regarding exercise of the police power, *e.g.,* regulation or prohibition of liquor traffic or race-track betting or passage of a general building, traffic or zoning laws, legislators may follow the wishes of their constituents. Such action is not subject to judicial review. But in restricting individual rights by exercise of the police power neither a municipal corporation nor the state legislature itself can deprive an individual of property rights by a plebiscite of neighbors or for their benefit. . . . there is a wide difference between exercise of the police power in accordance with a comprehensive zoning plan, which imposes mutual restrictions and confers mutual benefits on property owners, and arbitrary permission to A and prohibition to B to use their own property, at the pleasure of neighbors or at the whim of legislative or administrative agencies." (Citations omitted.)

The phrase "plebiscite of neighbors" in the above quotation was explicated in *Steuart Petroleum Co. v. Board of County Commissioners,* 276 Md. 435, 445, 347 A.2d 854 (1975):

> "[A] 'plebiscite of the neighbors' or 'of the neighborhood' refers to instances where the action of an administrative body which effects a change in zoning and deprives an individual of a property right is predicated on the pleasure of the owners of nearby property rather than on a comprehensive plan, which imposes mutual restrictions and confers mutual benefits on all." (Citations omitted.)

Without doubt, written and vocal opposition to Mr. Mears' proposed expansion was widespread in the Town of Oxford. Such public sentiment cannot support the imposition of arbitrary restrictions on the property rights of individuals.

*Northwest Merchants Terminal, Inc. v. O'Rourke,* 191 Md. 171, 60 A.2d 743 (1948); *Benner, supra; Mayor of Rockville v. Cotler,* 230 Md. 335, 187 A.2d 94 (1963). However, the "wishes of constituents" are a prime factor in enacting comprehensive general ordinances applicable to all property owners. *Benner, supra,* 190 Md. at 20. Certainly, Ordinance 165 is such a comprehensive scheme aimed at regulating all expansion in Town Creek. Therefore, the cases cited by appellant supporting his "impermissible plebiscite" theory are inapposite since all deal with arbitrary restrictions imposed upon an individual property owner in response to public clamor.

As appellee points out in his brief, appellant's theory may have had legitimacy if he had applied to the port wardens for a permit and was turned down in response to public demand without other evidence of adverse impact. *See* Part IV, *infra.* But here, appellant cannot use the judicial authority outlawing specific arbitrary acts by governmental entities to dislodge a pervasive regulatory design for all marina expansion.

Second, appellant fails to distinguish between a municipality's legislative enactments and its fact-finding determinations. When a municipal body adopts ordinances or promulgates regulations, it performs a legislative function. *Ritchmount Partnership v. Supervisors of Elections,* 283 Md. 48, 56, 388 A.2d 523 (1978). When a board or agency makes factual determinations, decides contested issues, or reviews applications, it performs a quasi-judicial function. *Maryland Board of Registration v. Armacost,* 286 Md. 353, 355, 407 A.2d 1148 (1979).

Upon this distinction rests the proper scope of appellate review. In reviewing the constitutionality of legislative acts, the critical question is whether the challenged legislation bears "a real and substantial relation to the public health, morals, safety, and welfare of the citizens. . . ." *Bowie Inn, Inc. v. Bowie,* 274 Md. 230, 236, 335 A.2d 679 (1975). Further, the ordinance is presumed constitutional; the party attacking it must show the absence of any substantial relation to the public benefit, *Commission on Medical Disci-*

*pline v. Stillman,* 291 Md. 390, 407, 435 A.2d 747 (1981), or to a legitimate governmental objective, *Comprehensive Accounting Service Co. v. Board of Public Accountancy,* 284 Md. 474, 397 A.2d 1019 (1979). The distinction has been consistently applied. *Mayor of Baltimore v. Biermann,* 187 Md. 514, 523, 50 A.2d 804 (1947); *Department of Natural Resources v. Linchester Sand and Gravel Corp.,* 274 Md. 211, 224, 334 A.2d 514 (1975); *Stillman, supra;* and *D'Anna v. Secretary of Personnel,* 47 Md. App. 180, 186, 422 A.2d 50 (1980), *cert. denied,* 289 Md. 734 (1981).

The test of the validity of an ordinance as an exercise of police power is found in *Potomac Sand and Gravel Co. v. Governor,* 266 Md. 358, 293 A.2d 241 (1972), *cert. denied,* 409 U.S. 1040 (1972). A court must ascertain:

> "(1) that the interests of the public generally, as distinguished from those of a particular class, require such interference; (2) that the means are reasonably necessary for the accomplishment of the purpose; and (3) that the means are not unduly oppressive upon individuals." *Id.* at 373. (Citations omitted.)

Determining the reasonableness of the means used to accomplish the legitimate purpose may depend on whether "there are any considerations relating to the public welfare by which it can be supported. . . ." *Maryland Board of Pharmacy v. Sav-A-Lot, Inc.,* 270 Md. 103, 106, 311 A.2d 242 (1973). The ordinance will be found constitutional if any facts that would sustain its constitutionality may be reasonably conceived. *Edgewood Nursing Home v. Maxwell,* 282 Md. 422, 427, 384 A.2d 748 (1978).

In this case, that conception is not difficult — Town Creek is one of Oxford's major assets and attractions, a limited natural resource [9] worthy of protection for the benefit of the general public. As Judge Clark stated at the hearing:

> "[F]or the protection of the Creek this sort of leg-

---

**9.** The Court of Appeals has recognized that protection of a natural resource is a valid and proper objective of legislation adopted pursuant to the police power. Potomac Sand & Gravel Co. v. Governor, 266 Md. 358, 371,

islation was necessary, not only because of what Mears was going to do, but because if Mears can do it, so can everybody else. And it was time to really bring a halt to unbridled expansion within Town Creek, or in the not-too-distant future you'd be able to walk across the creek without getting your feet wet, or almost do so."

In summary, the record sustains the trial court's conclusions that: protection of Town Creek was a legitimate exercise of the police power that would benefit the public health, safety and welfare; development of Town Creek had reached a point at which further "unbridled expansion" would be detrimental; regulation of construction and marina expansion in Town Creek was substantially related to protection of the creek; Ordinance 165 was a reasonable way of regulating construction; and the permit and license requirements for development was not unduly oppressive upon individuals.[10]

Lastly, appellant fails to distinguish between "a special law for a special case," *Secretary of Personnel v. Bender,* 44 Md. App. 714, 725, 411 A.2d 107 (1980), and "a law intended to serve a particular need, to meet some special evil, or to promote some public interest, for which the general law is inadequate, . . . ," *Norris v. Mayor of Baltimore,* 172 Md. 667, 683, 192 A. 531 (1937). Appellant asserts that Ordinance 165 violates Article III, Section 33 of the Maryland Constitu-

---

293 A.2d 241 (1972), *cert. denied,* 409 U.S. 1040 (1972). Further, "when improvements are made into the navigable waters by a riparian proprietor, the land utilized in their construction, which prior to completion belonged to the State, for all practical purposes becomes a part of his fast land." Harbor Island Marina v. Bd. of County Comm'rs, 286 Md. 303, 322, 407 A.2d 738 (1979). Therefore, commercial marina expansion in effect removes from the public domain open space previously available to the public. Certainly, as appellee notes, it is reasonable for local government to regulate such a "taking" of municipal waters.

10. Without clause 3, the ordinance no longer limits expansion only of commercial marinas. The Board of Port Wardens is required to evaluate any expansion plans, commercial or otherwise, "taking into account . . . the effect of present and proposed uses on marine life, wildlife, conservation, water pollution, erosion, navigational hazards, . . . congestion within the waters, . . . riparian property owners, and . . . present and projected needs for . . . commercial or industrial use." *See* n.8, *supra.*

420

tion [11] because it purports to regulate water quality, already covered under federal and state general laws,[12] and it thwarts the expansion plans of the only marina that could expand substantially under the Oxford Zoning Ordinance. For the latter proposition, appellant relies principally on *Beauchamp v. Somerset County Sanitary Commission,* 256 Md. 541, 261 A.2d 461 (1970), which held that a local law exempting American Legion Post property from assessment by the county sanitary commission was invalid as a special law because its "practical effect" was to benefit one taxpayer only. *Id.* at 549.

---

11. Article III, § 33, Constitution of Maryland (1981 Repl. Vol.), reads in pertinent part:

"And the General Assembly shall pass no special Law for any case, for which provision has been made, by an existing General Law. The General Assembly, as its first Session after the adoption of this Constitution, shall pass General Laws, providing for the cases enumerated in this section, which are not already adequately provided for, and for all other cases, where a General Law can be made applicable."

While the constitutional provision speaks to the power of the General Assembly, it logically applies to the legislative bodies of municipalities to which the General Assembly had delegated power. *See* Vermont Fed. Sav. & Loan Ass'n v. Wicomico County, 263 Md. 178, 182-3, 283 A.2d 384 (1971); Potomac Sand and Gravel Co. v. Governor, 266 Md. 358, 378-9, 293 A.2d 241 (1972), *cert. denied,* 409 U.S. 1040 (1972).

12. The State of Maryland has enacted a comprehensive program of water quality protection for waters within the state, including Town Creek, Md. Nat. Res. Code, § 8-1401 *et seq.* (1974); COMAR 10.50.01. Responsibility for that program is shared between two state agencies: the Department of Natural Resources and the Department of Health and Mental Hygiene. *Id.,* § 8-1404 (a). Furthermore the state's comprehensive program has qualified it for participation in the Natural Pollution Discharge Elimination System, 33 U.S.C. § 1342 (b), pursuant to which the United States Environmental Protection Agency has delegated federal authority to those state agencies.

Under these authorities, the state has established water quality standards for each body of water in the state. COMAR 10.50.01.02 *et seq.*

A marina or other comparable waterfront facility generally does not involve a direct discharge of wastewaters, which would require a state discharge permit. Nat. Res. § 8-1405; COMAR 10.50.01.08. However, whenever a facility requires a federal license and a potential impact on water resources is presented, the state must issue a "water quality certification" prior to any federal action. 33 U.S.C. § 1341. In the present case, the Corps of Engineers required such a certification from the state, which was in fact issued.

*See* n.2., *supra. See also* Board of Appeals v. The Marina Apts., Inc., 272 Md. 691, 326 A.2d 734 (1974).

In this case, Ordinance 165 applies on its face to any riparian owner who contemplates construction within municipal waters; the point is not whether these owners can or will expand but rather that all are covered should they attempt to do so. *See Reyes v. Prince George's County,* 281 Md. 279, 380 A.2d 12 (1977). Thus, appellant's reliance on *Beauchamp, supra,* is misplaced.

Also, there was no comprehensive town statute regulating construction in municipal waters prior to the enactment of Ordinance 165.[13] The town's zoning laws did not cover the water areas adequately. The remedy for this omission was provided by the Maryland General Assembly in Art. 23A § 2 (23A) to enable port towns to follow the example of Annapolis in preserving their unique and precious heritage. *See Mayor of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 396 A.2d 1080 (1979).

## IV

Even if Ordinance 165 is constitutional, appellant contends that it should not govern the proposed expansion of his marina, relying on *Mayor of Baltimore v. Cohn,* 204 Md. 523, 105 A.2d 482 (1954) for the premise that a valid ordinance's application to a particular property may be found arbitrary and capricious. We agree that:

> "A case may arise in which the application of the ordinance might be discriminatory, or arbitrary, unreasonable or capricious in a legal sense so far as applied to a particular factual situation, . . . ."

*Gino's v. Mayor of Baltimore,* 250 Md. 621, 638, 244 A.2d 218 (1968). However, in the present posture of this case, we have no application of the ordinance to Mr. Mears upon which the trial court could base an arbitrary and capricious finding.[14]

---

**13.** Article 23A § 2 (23A) (i), Md. Ann. Code (1981 Repl. Vol.) states that the provision establishing the Board of Port Wardens and delineating its powers is not intended to affect or conflict with any zoning power of a municipality. Thus, it seems clear that Art. 23A § 2 (23A) was meant to complement existing and future zoning laws.

**14.** Appellant argues that the public records of Oxford showing the personal biases of two commissioners support the "inescapable inference"

In evaluating the effects of any proposed construction "on marine life, wildlife, conservation, water pollution, erosion, navigational hazards" and traffic congestion, the Board of Port Wardens will have to consider the positive evidence presented by the permit applicant, at least to the level of the "fairly debatable" standard of appeallate review. Thus, the regulatory process of Ordinance 165 will have a "practical effect," not of stopping Mr. Mears' marina expansion in Town Creek, but rather of controlling the amount and rate of development. *Cf. Beauchamp, supra,* 256 Md. at 549 (effect of legislation was to exempt only one American Legion post from sanitary assessment).[15]

## V

Finally, we consider appellant's procedural argument that summary judgment for the Town of Oxford was not the proper vehicle in which to uphold the validity of Ordinance 165. We see no reason why not. Mr. Mears originally sought a declaratory judgment, then moved for summary judgment. In support, appellant argued below that "no facts are seriously in dispute . . . which can be dispositive of this case

that the enactment of Ordinance 165 was itself arbitrary and capricious, relying on the rationale of three out-of-state cases: City of Los Angeles v. Trujillo, 81 Cal.Rptr. 146 (Ct.App. 1969); McNamara v. Borough of Saddle River, 158 A.2d 722 (N.J.Super. 1960); Commercial Properties, Inc. v. Peternel, 211 A.2d 514 (Pa. 1965). *Trujillo, supra,* held that a court may inquire into the motives behind a legislative enactment where it shows on its face or in its results an improper purpose. 81 Cal. Rptr. at 149. No such impropriety is facially apparent in this case and we have no results of Ordinance 165's application upon which to find any impropriety. *McNamara, supra,* is also distinguishable in that Ordinance 165 was not enacted in response to "vigorous personal opposition" to Mr. Mears' expansion. 158 A.2d at 725. *Commercial Properties, supra,* is similarly distinguishable because the "sole purpose" of Ordinance 165 was not to prevent Mr. Mears from expanding at all but to regulate any expansion. 211 A.2d at 518.

15. At oral argument, counsel for Mr. Mears informed us in response to a question that he subsequently made application for a permit under Ordinance 165. This has been denied and an appeal is pending. In ruling below, the court noted that several state and federal agencies voiced no objections to Mr. Mears' expansion plan; that the State Department of Natural Resources issued a water quality certificate in October 1979; and that the U.S. Army Corps of Engineers wrote a highly favorable report on Mr. Mears' application, discounting the concerns expressed by the Town of Oxford and granting him permission to expand.

. . . I don't think there's any dispute of fact. . . ." On appeal, he contends that "[c]onflicts of interest, biases and thinly disguised vendettas are factual determinations, material to the validity of the ordinance and the exercise of police power. . . ." Appellant cannot have it both ways, arguing that he should not be granted summary judgment because there are no genuine disputes over material facts but that his opponent should not be granted summary judgment because there are genuine disputes over material facts. *Salisbury Beauty Schools v. Board of Cosmetologists,* 268 Md. 32, 45-6, 300 A.2d 367 (1973). Cited in *Prince George's Properties, Inc. v. Rogers,* 275 Md. 582, 587, 341 A.2d 804 (1975).

Further, the *Salisbury* case establishes that the rational relationship between a statute and the public welfare may be found on the face of the statute alone. *Salisbury, supra,* 268 Md. at 56. The language of Ordinance 165 clearly indicates that its purpose is to protect a natural resource, and it is unnecessary to look beyond the wording of an ordinance "when the wording itself clearly establishes legislative intent." *Mayor of Baltimore v. Mano Swartz, Inc.,* 268 Md. 79, 86, 299 A.2d 828 (1973). Protection of a natural resource has been held a valid and proper objective of a legislative exercise of the police power. *Potomac Sand and Gravel Co., supra,* 266 Md. at 371. Since the wording plainly reflects an intent to achieve a legitimate goal of the police power, the court below correctly granted summary judgment to the Town of Oxford.[16]

> *Judgment affirmed; appellant to pay the costs.*

---

**16.** The three cases cited by the appellant in support of its summary judgment argument are inapposite to the proposition he asserts: that conflicts of interest, biases and vendettas are factual determinations, material to the validity of the ordinance. As pointed out in appellee's brief, *Lykins v. State,* 288 Md. 71, 415 A.2d 1113 (1980), did not involve legislation, but, rather, allegations of prosecutorial misconduct stemming from the State's Attorney's previous representation of a criminal defendant in a matter related to the charges for which she was now being prosecuted. *Beshore v. Town of Bel Air,* 237 Md. 398, 206 A.2d 678 (1965), involved allegations of pecuniary conflicts of interest by a local legislator. Finally, *Board of Appeals v. Walker,* 228 Md. 574, 180 A.2d 865 (1962), involved a decision by a member of Montgomery County's Board of Zoning Appeals that his prior activities and representation of one of the parties prevented him from hearing facts in a quasi-judicial capacity.